ROBERT J. KAUFMAN *v.* ZONING COMMISSION OF
THE CITY OF DANBURY
(15021)

PETERS, C. J., and BORDEN, BERDON, NORCOTT and PALMER, Js.

Argued October 28, 1994—decision released February 7, 1995

*Daniel E. Casagrande,* for the appellant (defendant).

*Thomas W. VanLenten,* with whom, on the brief, was *Melinda S. Monson,* for the appellee (plaintiff).

*Mary-Michelle U. Hirschoff* filed a brief for the Connecticut Conference of Municipalities as amicus curiae.

PETERS, C. J. This appeal concerns the effect of the affordable housing land use appeals act; General Stat-

utes § 8-30g;[1] on an application for a zone change. The defendant, the zoning commission of the city of Danbury (commission), denied the application of the plaintiff, Robert J. Kaufman, to amend the zoning map of

[1] General Statutes § 8-30g provides: "AFFORDABLE HOUSING LAND USE APPEALS PROCEDURE. (a) As used in this section: (1) 'Affordable housing development' means a proposed housing development (A) which is assisted housing or (B) in which not less than twenty per cent of the dwelling units will be conveyed by deeds containing covenants or restrictions which shall require that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing, as defined in section 8-39a, for persons and families whose income is less than or equal to eighty per cent of the area median income, for at least twenty years after the initial occupation of the proposed development; (2) 'affordable housing application' means any application made to a commission in connection with an affordable housing development by a person who proposes to develop such affordable housing; (3) 'assisted housing' means housing which is receiving, or will receive, financial assistance under any governmental program for the construction or substantial rehabilitation of low and moderate income housing, and any housing occupied by persons receiving rental assistance under chapter 138a or Section 1437f of Title 42 of the United States Code; (4) 'commission' means a zoning commission, planning commission, planning and zoning commission, zoning board of appeals or municipal agency exercising zoning or planning authority; and (5) 'municipality' means any town, city or borough, whether consolidated or unconsolidated.

"(b) Any person whose affordable housing application is denied or is approved with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units, specified in subparagraph (B) of subdivision (1) of subsection (a) of this section, contained in the affordable housing development, may appeal such decision pursuant to the procedures of this section. Such appeal shall be filed within the time period for filing appeals as set forth in sections 8-8, 8-9, 8-28, 8-30, or 8-30a, as applicable, and shall be made returnable to the superior court for the judicial district of Hartford-New Britain. Affordable housing appeals shall be heard by a judge assigned by the chief court administrator to hear such appeals. To the extent practicable, efforts shall be made to assign such cases to a small number of judges so that a consistent body of expertise can be developed. Appeals taken pursuant to this subsection shall be privileged cases to be heard by the court as soon after the return day as is practicable. Except as otherwise provided in this section, appeals involving an affordable housing application shall proceed in conformance with the provisions of said sections 8-8, 8-9, 8-28, 8-30, or 8-30a, as applicable.

"(c) Upon an appeal taken under subsection (b) of this section, the burden shall be on the commission to prove, based upon the evidence in the

the city of Danbury to change the classification of the plaintiff's property from RA-40 (1 single-family dwelling per acre) to RA-8 (5 single-family dwellings per acre). The plaintiff appealed from the commission's

record compiled before such commission that (1) the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record; (2) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (3) such public interests clearly outweigh the need for affordable housing; and (4) such public interests cannot be protected by reasonable changes to the affordable housing development. If the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it.

"(d) Following a decision by a commission to reject an affordable housing application or to approve an application with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units, the applicant may, within the period for filing an appeal of such decision, submit to the commission a proposed modification of its proposal responding to some or all of the objections or restrictions articulated by the commission, which shall be treated as an amendment to the original proposal. The filing of such a proposed modification shall stay the period for filing an appeal from the decision of the commission on the original application. The commission may hold a public hearing and shall render a decision on the proposed modification within forty-five days of the receipt of such proposed modification. The commission shall issue notice of its decision as provided by law. Failure of the commission to render a decision within said forty-five days shall constitute a rejection of the proposed modification. Within the time period for filing an appeal on the proposed modification as set forth in sections 8-8, 8-9, 8-28, 8-30, or 8-30a, as applicable, the applicant may appeal the commission's decision on the original application and the proposed modification in the manner set forth in this section. Nothing in this subsection shall be construed to limit the right of an applicant to appeal the original decision of the commission in the manner set forth in this section without submitting a proposed modification or to limit the issues which may be raised in any appeal under this section.

"(e) Nothing in this section shall be deemed to preclude any right of appeal under the provisions of sections 8-8, 8-9, 8-28, 8-30, or 8-30a.

"(f) Notwithstanding the provisions of subsections (a) to (e), inclusive, of this section, the affordable housing appeals procedure established under this section shall not be available if the real property which is the subject of the application is located in a municipality in which at least ten per cent of all dwelling units in the municipality are (1) assisted housing or (2) cur-

decision to the Superior Court, which rendered judgment reversing that decision and remanded the case to the commission with direction that the application be approved. After the commission successfully petitioned the Appellate Court for certification to appeal from the judgment of the trial court; see General Statutes §§ 8-8, 8-9[2] and 8-30g; we transferred the appeal

rently financed by Connecticut Housing Finance Authority mortgages or (3) subject to deeds containing covenants or restrictions which require that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing, as defined in section 8-39a, for persons and families whose income is less than or equal to eighty per cent of the area median income. The commissioner of housing shall, pursuant to regulations adopted under the provisions of chapter 54, promulgate a list of municipalities which satisfy the criteria contained in this subsection and shall update such list not less than annually.

"(g) Notwithstanding the provisions of subsections (a) to (e), inclusive, of this section, the affordable housing appeals procedure shall not be applicable to an affordable housing application filed with a commission during the one-year period after a certification of affordable housing project completion issued by the commissioner of housing is published in the Connecticut Law Journal. The commissioner of housing shall issue a certification of affordable housing project completion for the purposes of this subsection upon finding that (1) the municipality has completed an initial eligible housing development or developments pursuant to section 8-336f or sections 8-386 and 8-387 which create affordable dwelling units equal to at least one per cent of all dwelling units in the municipality and (2) the municipality is actively involved in the Connecticut housing partnership program or the regional fair housing compact pilot program under said sections. The affordable housing appeals procedure shall be applicable to affordable housing applications filed with a commission after such one-year period, except as otherwise provided in subsection (f) of this section."

[2] General Statutes § 8-8 provides in relevant part: "(b) Except as provided in subsections (c) and (d) of this section and sections 7-147 and 7-147i, any person aggrieved by any decision of a board may take an appeal to the superior court for the judicial district in which the municipality is located. . . .

"(l) The court, after a hearing thereon, may reverse or affirm, wholly or partly, or may modify or revise the decision appealed from. . . .

"(o) There shall be no right to further review except to the appellate court by certification for review, on the vote of two judges of the appellate court so to certify and under such other rules as the judges of the appellate court establish. The procedure on appeal to the appellate court shall, except as

to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

The underlying facts are undisputed. In his modified application for a zone change, the plaintiff, a developer, sought to change the zoning of 27.4 acres of his Danbury property to an "RA-8" classification, which, if granted, would permit him to build 102 houses.[3] At the time the plaintiff purchased the land, the entire parcel was zoned "RA-40," a zoning classification that allowed construction of twenty-seven houses.

The plaintiff filed his application for a zone change on a form provided by the defendant. In response to an inquiry on the form asking the applicant to "[s]tate briefly why this petition should be granted," the plaintiff wrote, "[t]he property is to be developed as an affordable housing project in conformance and pursuant to the Connecticut General Statutes relating to affordable housing projects."

After several public hearings on the plaintiff's original and modified applications, the commission voted by a margin of five to three to deny the modified application. In its letter, dated February 10, 1992, notify-

otherwise provided herein, be in accordance with the procedures provided by rule or law for the appeal of judgments rendered by the superior court unless modified by rule of the judges of the appellate court."

General Statutes § 8-9 provides: "APPEALS FROM ZONING COMMISSIONS AND PLANNING AND ZONING COMMISSIONS. REVIEW BY APPELLATE COURT. Appeals from zoning commissions and planning and zoning commissions may be taken to the superior court and, upon certification for review, to the appellate court in the manner provided in section 8-8."

[3] In his original application, the plaintiff had sought a zone change for 48.715 acres. Upon the defendant's denial of this application, he filed the amended application for lesser acreage. The plaintiff appealed to the trial court from both the denial of the original application and the denial of the modified application. The trial court confined its review, however, to the denial of the modified application. Because the plaintiff has not appealed from this determination by the trial court, we likewise will address only the denial of the modified application.

ing the plaintiff of the denial, the commission stated the following four reasons for its decision: "[1] The proposed density is too high for the proposed area, it was in the Plan of Development as an RA-40 zone and it should remain that way. [2] The increase in traffic and the detrimental effect on fire safety would make an adverse situation. [3] The environmental issue that there could be considerable impact on the Lake Kenosia watershed. [4] The need for affordable housing does not clearly outweigh the need to preserve the neighborhood as it presently exists."

The trial court sustained the plaintiff's timely appeal from the decision of the commission. After making a finding that the plaintiff's zone change application had been made "in connection with an affordable housing development"; General Statutes § 8-30g; and that the plaintiff's appeal therefore would be governed by the substantive and procedural standards set out in § 8-30g, the trial court concluded that the commission had failed to sustain the burden of proof imposed upon the commission by § 8-30g. The trial court concluded that the commission was required to approve the plaintiff's application, but ordered a remand to give the commission the opportunity to impose reasonable conditions and changes with respect thereto.[4]

On appeal from the judgment of the trial court, the commission makes three claims. The commission argues that: (1) the trial court improperly held § 8-30g

---

[4] The trial court's initial decision concluded that "the court has resolved all [of] the issues in favor of the plaintiff and therefore the court orders that the plaintiff's modified application be approved under such terms and conditions as the commission might reasonably prescribe within the parameters of this ruling. For this purpose and to this end, the decision is hereby remanded to the commission." In response to the commission's motion for further articulation as to the scope of the remand, the trial court explained that while the commission was empowered on remand "to impose reasonable conditions and reasonable changes" on the application, it was not empowered to deny the application entirely.

to be applicable, because the plaintiff's application for a zone change was not an "affordable housing application"; (2) even if § 8-30g is applicable, the trial court improperly determined that there was insufficient evidence in the record to support the commission's conclusion that the zone change would threaten the Lake Kenosia watershed; and (3) even if § 8-30g is applicable, the trial court improperly rejected the commission's conclusion that it was necessary to deny the zone change to prevent increased traffic.[5] Prior to oral argument, this court sua sponte raised a fourth issue, whether the trial court's judgment ordering a remand was a final judgment that would sustain an immediate appeal.

We conclude, as both parties have argued in their supplemental briefs on the jurisdictional issue, that this court has subject matter jurisdiction over the appeal. On the merits, we affirm the judgment of the trial court.

I

The first issue before us is whether the judgment of the trial court, remanding the case to the commission, was an appealable final judgment. Because the provisions of the Uniform Administrative Procedure Act[6] do not govern a zoning appeal; see General Statutes §§ 8-8 (o), 8-9 and 8-30g (b); it is the scope of the remand order in this particular case that determines the finality of the trial court's judgment. *Eastern Connecticut Cable Television, Inc.* v. *Dept. of Public Utility Control,*

---

[5] The commission also claims that the trial court improperly required the commission to prove that the public interests it had sought to protect had clearly outweighed the *statewide* need for affordable housing, when it should have required the commission to prove only that those public interests had clearly outweighed the need for affordable housing *in Danbury*. As we explain in footnote 25, we need not reach this claim.

[6] For appeals governed by the Uniform Administrative Procedure Act, General Statutes § 4-183 (j) provides in relevant part: "For purposes of this section, a remand is a final judgment."

214 Conn. 609, 613, 573 A.2d 311 (1990). A judgment
of remand is final if it " 'so concludes the rights of the
parties that further proceedings cannot affect them.' "
Id., quoting *State* v. *Curcio*, 191 Conn. 27, 31, 463 A.2d
566 (1983); see also *Schieffelin & Co.* v. *Dept. of Liquor
Control*, 202 Conn. 405, 409–11, 521 A.2d 566 (1987).
A judgment of remand is not final, however, if it
"requires [the agency to make] further evidentiary
determinations that are not merely ministerial." *East-
ern Connecticut Cable Television, Inc.* v. *Dept. of Pub-
lic Utility Control*, supra, 614. In light of the terms of
the trial court's remand order, as explained in the
court's response to the commission's motion for artic-
ulation, we are persuaded that the trial court's judg-
ment meets the test for finality.[7]

We attach significance to the fact that the trial
court's judgment did not order further evidentiary
determinations on remand. Although the trial court's
remand may have *allowed* the commission to hear addi-
tional evidence in order to determine whether to impose
"reasonable conditions" on or to make "reasonable
changes" in the application, the remand in no way
*required* the commission to conduct such an inquiry.

---

[7] We assume without deciding that if the trial court judgment had not
been final, this court could not have exercised jurisdiction over the appeal,
even though certification was granted by the Appellate Court. But see Gen-
eral Statutes § 52-263 (aggrieved party may "appeal to the court having
jurisdiction *from the final judgment of the court* or of such judge, or from
the decision of the court granting a motion to set aside a verdict, *except
in* small claims cases, which shall not be appealable, and *appeals as pro-
vided in sections 8-8 and 8-9*" [emphasis added]); General Statutes §§ 8-8 (o),
8-9 (right to appeal not explicitly limited to appeals from final judgments
of trial court but instead to cases in which appellate court has certified ques-
tion for review; noting, however, that upon certification, normal appellate
procedures are to be followed unless modified by rule); *State* v. *Ayala*, 222
Conn. 331, 340, 610 A.2d 1162 (1992) ("legislature also has the authority
to make interlocutory orders immediately reviewable, in summary fash-
ion, by authorizing petitions for review, usually within a limited time period,
and often specifically to the Appellate Court").

Even more important, the trial court's judgment required the commission to approve the plaintiff's application. With respect to this central issue, the trial court's decision " 'so concludes the rights of the parties that further proceedings cannot affect them.' " *Eastern Connecticut Cable Television, Inc.* v. *Dept. of Public Utility Control*, supra, 214 Conn. 613, quoting *State* v. *Curcio*, supra, 191 Conn. 31. After explicitly resolving *"all* [of] the issues in favor of the plaintiff" (emphasis added), the trial court remanded the case only for the limited purpose of allowing the commission to impose reasonable conditions on or make reasonable changes to the development, if it so chose. Because the proceedings on remand cannot deprive the plaintiff of the zone change that the trial court has ordered to be approved, the trial court has rendered a final judgment and this court has subject matter jurisdiction over the commission's appeal. See generally *Schieffelin & Co.* v. *Dept. of Liquor Control*, supra, 202 Conn. 409–11.

## II

We turn now to the merits of the commission's claims. The commission first argues that the trial court improperly determined that the plaintiff's application for a zone change had been an "affordable housing application," such that § 8-30g applied to the plaintiff's appeal. The commission's argument is in two parts. First, the commission contends that the plaintiff's application was not an "affordable housing application" because the application failed to include specific development plans. Second, the commission contends that the plaintiff failed to provide adequate evidence that, if the zone change were granted, he would build affordable housing. We are not persuaded by either argument.

## A

The commission first argues that § 8-30g governs a zoning appeal only if, at the time of an application for a zone change, the applicant submitted specific affordable housing plans. This contention must be placed in context.

Apart from § 8-30g, local zoning commissions have discretion to prescribe the materials that must be submitted in connection with a zone change application. See General Statutes § 8-3.[8] Although zoning commissions may require the submission of site plans for all zone change applications, Danbury's zoning regulations contain no such requirements. The commission therefore conceded at oral argument that the plaintiff's zone change application contained all the information that Danbury regulations normally require. Compare Danbury Zoning Regs. §§ 9.C, 10.A (Rev. to June 24, 1991) (governing applications for amendments to zoning map; not requiring submission of site plans), with Danbury Zoning Regs. § 3.P (Rev. to June 24, 1991) (governing applications for special permits and special exceptions; requiring submission of site plans).

Without regard to § 8-30g, zoning commissions, before acting on a zone change application, may also ask an applicant to submit additional information during the course of hearings on the application. Concededly, the commission in this case never asked the

---

[8] General Statutes § 8-3 provides in relevant part: "ESTABLISHMENT AND CHANGING OF ZONING REGULATIONS AND DISTRICTS. . . . (a) Such zoning commission shall provide for the manner in which regulations under section 8-2 and the boundaries of zoning districts shall be respectively established or changed. . . .

"(c) All petitions requesting a change in the regulations or the boundaries of zoning districts shall be submitted in writing and in a form prescribed by the commission and shall be considered at a public hearing within the period of time permitted under section 8-7d. . . ."

plaintiff to submit site plans during the course of the hearings. It is undisputed, furthermore, that whenever the commission did request additional information, the plaintiff responded to the request.

The commission's argument, therefore, devolves into the proposition that § 8-30g, by itself, required the plaintiff to submit site plans at the time of his application, and that the plaintiff's failure to submit such plans deprives him of the benefits of § 8-30g on appeal. We disagree.

The interpretation of § 8-30g "is a question of law for the court. . . . We approach this question according to well established principles of statutory construction designed to further our fundamental objective of ascertaining and giving effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Citations omitted; internal quotation marks omitted.) *North Haven* v. *Planning & Zoning Commission*, 220 Conn. 556, 561–62, 600 A.2d 1004 (1991); accord *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, 228 Conn. 498, 507–508, 636 A.2d 1342 (1994).

The commission does not argue that § 8-30g explicitly requires the submission of site plans in connection with a zone change application. The commission contends, rather, that we should infer such a requirement from four requirements that the statute does contain. The commission maintains that the applicant must submit specific plans because the statute requires that the application: (1) be made "in connection with an affordable housing *development*" (emphasis added); General

Statutes § 8-30g (a) (2); and, in the view of the commission, the word "development" means a *planned* scheme for construction in a particular area; (2) be reviewed by the commission and the trial court to determine whether the proposed housing is "affordable" within the meaning of the statute;[9] (3) be considered by the commission to determine the effect of the proposed affordable housing on "public interests" such as health, safety and the environment; see General Statutes § 8-30g (c) (2) through (4); and (4) be assessed by the commission to determine whether affected public interests could be protected through "reasonable changes" to the proposal. See General Statutes § 8-30g (c) (4). We are unpersuaded.

We can discern no reason, as a matter of statutory construction, why the commission and the trial court, on appeal, were unable to fulfill their respective statutory obligations without the submission of site plans with the plaintiff's zone change application. First, the commission has failed to identify any specific information about the nature of the development or the housing's affordability that the plaintiff, upon the commission's request, could not or did not furnish. Second, in reviewing other requested zone changes without specific site plans, this commission regularly discharges its responsibility for considering the "public interest"; General Statutes § 8-2;[10] and can equally do so here.

---

[9] The commission argues, on the basis of an unreported decision of the Superior Court; see *Wisniowski* v. *Planning Commission*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV9205110175 (May 14, 1993, 9 Conn. L. Rptr. No. 7, 193, 195–97); that § 8-30g requires the affordable units to be of comparable size and workmanship to the unrestricted units. We express no opinion as to the propriety of such a requirement. The commission also argues that the sales prices of the affordable units must meet the restrictions contained in § 8-30g.

[10] General Statutes § 8-2 provides in relevant part: "REGULATIONS. (a) The zoning commission of each city, town or borough is authorized to regulate, within the limits of such municipality, the height, number of stories and

Finally, in responding to the zone change application, in light of the evidence on the record at that time, the

size of buildings and other structures; the percentage of the area of the lot that may be occupied; the size of yards, courts and other open spaces; the density of population and the location and use of buildings, structures and land for trade, industry, residence or other purposes, including water-dependent uses as defined in section 22a-93, and the height, size and location of advertising signs and billboards. Such bulk regulations may allow for cluster development as defined in section 8-18. Such zoning commission may divide the municipality into districts of such number, shape and area as may be best suited to carry out the purposes of this chapter; and, within such districts, it may regulate the erection, construction, reconstruction, alteration or use of buildings or structures and the use of land. All such regulations shall be uniform for each class or kind of buildings, structures or use of land throughout each district, but the regulations in one district may differ from those in another district, and may provide that certain classes or kinds of buildings, structures or uses of land are permitted only after obtaining a special permit or special exception from a zoning commission, planning commission, combined planning and zoning commission or zoning board of appeals, whichever commission or board the regulations may, notwithstanding any special act to the contrary, designate, subject to standards set forth in the regulations and to conditions necessary to protect the public health, safety, convenience and property values. In adopting such regulations the commission shall consider the plan of development prepared under section 8-23. Such regulations shall be designed to lessen congestion in the streets; to secure safety from fire, panic, flood and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population and to facilitate the adequate provision for transportation, water, sewerage, schools, parks and other public requirements. Such regulations shall be made with reasonable consideration as to the character of the district and its peculiar suitability for particular uses and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such municipality. Such regulations may, to the extent consistent with soil types, terrain, infrastructure capacity and the plan of development for the community, provide for cluster development, as defined in section 8-18, in residential zones. Such regulations shall also encourage the development of housing opportunities, including opportunities for multifamily dwellings, consistent with soil types, terrain and infrastructure capacity, for all residents of the municipality and the planning region in which the municipality is located, as designated by the secretary of the office of policy and management under section 16a-4a. Such regulations shall also promote housing choice and economic diversity in housing, including housing for both low and moderate income households,

commission was not obligated to anticipate "reasonable changes" that might subsequently be required in conjunction with the site plans.[11]

and shall encourage the development of housing which will meet the housing needs identified in the housing plan prepared pursuant to section 8-37t and in the housing component and the other components of the state plan of conservation and development prepared pursuant to section 16a-26. Zoning regulations shall be made with reasonable consideration for their impact on agriculture. Zoning regulations may be made with reasonable consideration for the protection of historic factors and shall be made with reasonable consideration for the protection of existing and potential public surface and ground drinking water supplies. On and after July 1, 1985, the regulations shall provide that proper provision be made for soil erosion and sediment control pursuant to section 22a-329. Such regulations may also encourage energy-efficient patterns of development, the use of solar and other renewable forms of energy, and energy conservation. The regulations may also provide for incentives for developers who use passive solar energy techniques, as defined in subsection (b) of section 8-25, in planning a residential subdivision development. The incentives may include, but not be limited to, cluster development, higher density development and performance standards for roads, sidewalks and underground facilities in the subdivision. Such regulations may provide for a municipal system for the creation of development rights and the permanent transfer of such development rights, which may include a system for the variance of density limits in connection with any such transfer. Such regulations may also provide for notice requirements in addition to those required by this chapter. No such regulations shall prohibit the operation of any family day care home or group day care home in a residential zone. Such regulations shall not impose conditions and requirements on manufactured homes having as their narrowest dimension twenty-two feet or more and built in accordance with federal manufactured home construction and safety standards or on lots containing such manufactured homes which are substantially different from conditions and requirements imposed on single-family dwellings and lots containing single-family dwellings. Such regulations shall not impose conditions and requirements on developments to be occupied by manufactured homes having as their narrowest dimension twenty-two feet or more and built in accordance with federal manufactured home construction and safety standards which are substantially different from conditions and requirements imposed on multifamily dwellings, lots containing multifamily dwellings, cluster developments or planned unit developments. Such regulations shall not prohibit the continuance of any nonconforming use, building or structure existing at the time of the adoption of such regulations. Such regulations shall not provide for the termination of any nonconforming use solely as a result of nonuse for a specified period of time without regard to the

We note, moreover, that nothing in § 8-30g requires a departure from Danbury's decision to separate "zone change" review from "site plan" review, and to entrust these reviews to two different agencies, respectively, the Danbury zoning commission and the Danbury planning commission. The language of § 8-30g strongly implies that the legislature intended not to interfere with the local discretion to apportion land use powers among various agencies. The statute assumes that many different types of applications will be brought to many different types of agencies, as it broadly applies to "*any* application made to *a* commission *in connection with* an affordable housing development" (emphasis added); General Statutes § 8-30g (a) (2); and as it defines "commission" as any "zoning commission, planning commission, planning and zoning commission, zoning board of appeals or municipal agency exercising zoning or planning authority." General Statutes § 8-30g (a) (4).[12]

intent of the property owner to maintain that use. Any city, town or borough which adopts the provisions of this chapter may, by vote of its legislative body, exempt municipal property from the regulations prescribed by the zoning commission of such city, town or borough; but unless it is so voted municipal property shall be subject to such regulations."

[11] In this case, while the record did not contain plans, it did contain information about the size and density of the zone and some limited design information about the proposed location of access roads, the plaintiff's intention to construct sewers, and other issues. To fulfill its burdens under § 8-30g (c) (4), therefore, the commission was required to show only that, on the basis of evidence in the record, it reasonably could have concluded that the public interests could not be protected by "reasonable changes" to the size of the zone, the density of the zone or the specific designs presented.

[12] In this respect, § 8-30g is unlike affordable housing statutes in some states, which explicitly consolidate the powers and duties of various land use agencies. See, e.g., Mass. Gen. L. c. 40B, § 21 (1993) (applicant may submit to "board of appeals" a "single application to build [affordable] housing in lieu of separate applications to the applicable local boards"; board of appeals "shall have the same power to issue permits or approvals as any local official who would otherwise act with respect to such application"); R. I. Gen. Stat. Ann. § 45-53-4 (1991) (consolidating same powers in "zoning board of review"); see also Conn. Joint Standing Committee Hearings,

We also disagree with the commission's claim that the legislative history of § 8-30g supports its contention that an applicant must submit detailed plans to support a zone change for affordable housing. The commission relies on the remarks of two state legislators and one committee witness. First, the commission quotes then Senator Richard Blumenthal, who remarked on the Senate floor that "it is important to understand that these decisions involve specific projects on particular pieces of land and do not provide for any kind of general zoning override." 32 S. Proc., Pt. 12, 1989 Sess., p. 4048. Next, the commission quotes then Representative William J. Cibes, Jr., who remarked on the House of Representatives floor that § 8-30g "is a narrow procedure which is available only to a few kinds of developers, developers who propose to build affordable housing . . . ." 32 H.R. Proc., Pt. 30, 1989 Sess., pp. 10663–64. Finally, the commission quotes Attorney Raphael Podolsky, who had helped to draft the bill that became § 8-30g while serving as a member of the governor's blue ribbon commission on housing. Podolsky testified before the planning and development committee that "[t]his bill addresses a situation where there is an actual developer whether for profit or nonprofit with actual access to land, whether owned or optioned, who wants to build something, who has plans to build it, who's gone through a zoning board of appeals and has been turned down. . . . [Y]ou're not dealing with theoretical zoning. You're dealing with actual practical applications to build units, and that is [a] very, very important part of this proposal." Conn. Joint Standing Committee Hearings, Planning and Development, Pt. 1, 1989 Sess., p. 304.

Planning and Development, Pt. 1, 1989 Sess., p. 299, testimony of Attorney Raphael Podolsky (drafting committee specifically rejected Massachusetts model and decided not to create consolidated administrative board).

We are unpersuaded that any of these statements sufficiently manifests a legislative intent that § 8-30g requires the submission of site plans with affordable housing applications for zone changes. None of the quoted individuals specifically expressed such an intention. In our view, the plaintiff in this case satisfies the definitions offered by both legislators: he is a "[developer] who propose[s] to build affordable housing"; 32 H.R. Proc., Pt. 30, 1989 Sess., pp. 10663–64, remarks of Representative William J. Cibes, Jr.; see part II B of this opinion; and his proposal is a specific project on a particular piece of land; see 32 S. Proc., Pt. 12, 1989 Sess., p. 4048, remarks of Senator Richard Blumenthal. The testimony of Podolsky is insufficient, in light of the silence of the statute and the silence of the legislators, to support the inference for which the commission contends.

We turn finally to the commission's contention that, to implement the legislative policy embodied in § 8-30g, we must interpolate into the statute a requirement that site plans be submitted in conjunction with zone change applications for affordable housing. The commission contends that, in the absence of such a requirement, developers regularly would submit affordable housing applications that failed to provide adequate information for zoning commissions to decide whether to change the zone. Such applications would impose costs on commissions to defend their zone change denials "without any assurance that, if the developer[s] prevailed [on appeal], affordable housing developments that comply with legitimate public interests would be built." The commission concludes: "This law is already revolutionary enough. The statute does not require the overly broad interpretation suggested by the trial court . . . ." We are again unpersuaded.

First, we reject the commission's premise that § 8-30g should be construed narrowly because it

changes the existing legal structure. As a remedial statute, § 8-30g "must be liberally construed in favor of those whom the legislature intended to benefit." (Internal quotation marks omitted.) *Concept Associates, Ltd.* v. *Board Of Tax Review*, 229 Conn. 618, 623, 642 A.2d 1186 (1994); see also *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, supra, 228 Conn. 511.

Second, we can discern no policy reason why site plans must be submitted to the commission as part of the zone change process to ensure that "affordable housing developments that comply with legitimate public interests [are] built." As we discussed above, the commission regularly determines whether zone changes affect the public interests without having access to site plans. As we explain below, the commission does not need site plans to ensure either that the new zone is used only for affordable housing; see part II B of this opinion; or that the actual development complies with the public interest. Other land use agencies will have the opportunity to consider whether subsequent specific site plans comport with legitimate public interests,[13] and the commission can make the zone change conditional on the future approvals of those other agencies. See part III B 2 of this opinion.

Finally, a strong policy consideration counsels against the commission's interpretation: the commission's interpretation would waste financial resources. To draw up formal site plans, developers must incur considerable expense. Moreover, because site plans are site-

---

[13] The plaintiff represented at oral argument, for example, that even if the zone change is approved in this case, he will not be able to develop the land until he submits specific plans to the environmental impact commission (for a wetlands permit), to the planning commission (for subdivision and road approval), to the building department (for a construction permit), to the health department (for handicapped accessibility certification) and to the engineering department (for road, sewer and drainage permits). The commission did not dispute the plaintiff's representation.

specific, such plans cannot be reused if a zone change is denied. Because many affordable housing developers are nonprofit organizations; see, e.g., *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, supra, 228 Conn. 503; we decline to interpolate into § 8-30g a requirement that would impose significant site planning expenses on developers who have not yet secured a zone change.

We conclude, therefore, that § 8-30g does not independently require an affordable housing developer to submit to the commission, at the time of his initial application in connection with an affordable housing development, any more detailed "plans" than an applicant who requests a zone change for a purpose other than affordable housing. A zoning commission undoubtedly is entitled to enact regulations requiring all zone change applicants, including applicants for zone changes in connection with affordable housing developments, at the time their applications are filed, to submit information that the commission will need to fulfill its duties. In addition, during the hearings on an application, a zoning commission undoubtedly is entitled, within the constraints imposed by its regulations, to require an applicant to provide whatever additional information the commission needs to fulfill its duties. The provisions of § 8-30g require nothing more.

## B

We next address the commission's argument that the plaintiff is not entitled to invoke § 8-30g on this appeal because he failed to provide adequate evidence to the commission that, if the zone change were granted, he would build affordable housing. We agree with the commission that an applicant cannot claim the benefits of § 8-30g in a zoning appeal without providing "some meaningful assurance" that he will build affordable housing. As the commission correctly argues, § 8-30g

applies to appeals only if the application was made "in connection with an affordable housing development"; General Statues § 8-30g (a) (2); i.e., only if the evidence demonstrates that the plaintiff proposed a "housing development (A) which is assisted housing or (B) in which not less than twenty percent of the dwelling units will be conveyed by deeds containing covenants or restrictions which shall require that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing." General Statutes § 8-30g (a) (1); see also *West Hartford Interfaith Coalition, Inc.* v. *Town Council,* supra, 228 Conn. 522. We disagree, however, that the plaintiff failed to meet his evidentiary burden in this case.

This issue comes to us within the constraints of the specific procedural record in this case. When the commission informed the plaintiff that his zone change application had been denied, the commission did not claim that the plaintiff had presented insufficient evidence that the plaintiff would build affordable housing. Indeed, the commission at all times treated the application as a valid "affordable housing application"; General Statutes § 8-30g (a) (2); and it denied the application for four specific reasons unrelated to the evidence of affordability. "[W]here a zoning commission has formally stated the reasons for its decision, the court should not go behind that official collective statement . . . [and] attempt to search out and speculate upon other reasons which might have influenced some or all of the members of the commission to reach the commission's final collective decision." *West Hartford Interfaith Coalition, Inc.* v. *Town Council,* supra, 228 Conn. 513; *DeMaria* v. *Planning & Zoning Commission,* 159 Conn. 534, 541, 271 A.2d 105 (1970). We need not determine, therefore, either whether the commission reasonably could have found, on the basis of the record before it, that the plaintiff would not build

affordable housing, or whether the commission would have had power to deny the application because of such a finding.

The only issue now before us is whether the *trial court* improperly determined that the plaintiff had provided sufficient evidence to the commission that the application had been made "in connection with an affordable housing development." General Statutes § 8-30g (a) (2). Because the trial court made its determination on the basis of the administrative record, without evaluating the credibility of witnesses or assessing the intent of the parties in light of additional evidence first presented at trial, "our review of the ruling of the trial court in this case is plenary." *Morton Buildings, Inc.* v. *Bannon*, 222 Conn. 49, 54, 607 A.2d 424 (1992).

In support of its determination that the plaintiff's application had been made "in connection with an affordable housing development"; General Statutes § 8-30g (a) (2); the trial court relied on the following facts that are contained in the record before the commission. "[T]he application in this case [states that] '[t]he property is to be developed as an affordable housing project in conformance [with] and pursuant to Conn. Gen. Stat. relating to affordable housing projects.' This statement is broad enough to embrace both assisted housing under subsection (a) (1) (A) or restricted housing under subsection [(a) (1) (B)]. The record reveals that at the hearing the applicant declared his election to build [deed] restricted housing. In addition he stated that 'a minimum of twenty percent would be devoted to affordable housing as that term is defined by law' and finally he stated that 'the maximum cost per unit would be $128,000.' "

The commission challenges both the trial court's factual findings and its ultimate conclusion. The commission disputes the factual finding that the housing would

be affordable because there was other evidence in the record that $128,000 was the *"starting price"* (emphasis added) per unit rather than the maximum price per unit. The commission disputes the factual finding that the housing would be deed restricted because proposed deed covenants and restrictions submitted by the plaintiff did not contain language restricting future sales prices of the homes. Finally, the commission disputes the legal conclusion that the application had been made "in connection with an affordable housing development"; General Statutes § 8-30g (a) (2); on the ground that an applicant cannot "meet the definitional test of § 8-30g (a) (1) (B) when the record contains no concrete evidence of the likelihood of compliance with the statute other than the applicant's representations." We disagree.

The trial court properly found that the proposed housing would be "affordable." As the trial court noted, the plaintiff had testified before the commission that at least 20 percent of the houses would be sold below the maximum price qualifying as "affordable" pursuant to § 8-30g and that "the maximum cost is a hundred-twenty-eight thousand [dollars]." The commission attempts to cast doubt on the plaintiff's testimony by referring to a sentence that was not uttered by the plaintiff, but that was contained in a marketing study prepared for the plaintiff's use. That study concludes that the affordable units would be marketable, because, "[g]iven the proposed price range of $128,000 starting price (for eighteen of the total 90 units) for 1,600 square feet of living area for a single family house, a comparable condominium would have to sell for not more than $96,000." We find nothing in the quoted sentence that clearly contradicts the plaintiff's testimony. Although inartfully drafted, the phrase "proposed price range of $128,000 starting price (for eighteen of the total 90 units)" can be interpreted to mean exactly what

the plaintiff promised: a "proposed price range of $128,000 (for eighteen of the total 90 units) and up." Notwithstanding the sentence in the marketing study, therefore, the trial court properly found that the plaintiff had intended to sell at least 20 percent of the units at $128,000 or less.

We also concur in the trial court's finding that the housing would be appropriately deed restricted. As the trial court noted, the plaintiff clearly expressed his intention to build deed restricted housing pursuant to § 8-30g (a) (2) in his application, his testimony, and the testimony of his attorney. The commission never asked to review the specific language that would be incorporated into the deed restrictions. Admittedly, the plaintiff's attorney voluntarily placed into the commission's record copies of deed restrictions that had been used in a previous housing project and that related to wetlands preservation, but not to affordable housing. At the time he introduced those deed restrictions, however, the plaintiff's attorney was not talking about the affordable housing component of the application, but instead about the environmental concerns that had been raised by Danbury's environmental impact commission. Nothing in the record suggests that the wetlands-related deed restrictions were to be the only deed restrictions. In addition, no other evidence casts doubt on the plaintiff's intentions to impose affordable housing-related deed restrictions; indeed, the commission admitted at trial that "the plaintiff's assurances . . . were made in good faith."

Finally, we conclude that the trial court properly determined that the plaintiff had proved all facts necessary to meet his legal burden of establishing an intent to build affordable housing. In the face of unchallenged representations with regard to the plaintiff's intention, the statute does not require specific additional evidence that the dwelling units "will be conveyed by deeds con-

taining covenants or restrictions . . . ." General Statutes § 8-30g (a) (1) (B). Indeed, we previously have affirmed a trial court's determination that an applicant's "proposed housing units would be deed restricted within the definition of § 8-30g (a) (1) (B)" on the basis of evidence that the "plaintiff *indicated its intent* to use a . . . declaration, containing restrictions and covenants that run with the land" similar to a declaration that had been used by other developers in the past. (Emphasis added.) *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, supra, 228 Conn. 524, 524–25 *(West Hartford)*.

The commission argues, however, that this case is distinguishable from *West Hartford*, because there is a risk that this plaintiff may renege on his promise to build affordable housing. The commission fears that, if it grants the plaintiff's zone change, it, unlike the West Hartford town council, will be powerless to prevent the newly created zone from being used for purposes other than affordable housing. The commission points out that in *West Hartford*, the applicant had sought not only a zone change but also a special development district designation, which incorporated the condition that, if the applicant failed to record the affordable housing deed restrictions in the town's land records, the designation would be rescinded.[14] The commission here maintains that it has no authority to impose a similar condition, because its regulations do not permit the granting of conditional zone changes and because, in the absence of authorizing regulations, the imposition of such conditions would violate the statutory injunction contained in § 8-2 that zoning regula-

---

[14] As we observed in *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, supra, 228 Conn. 524, the West Hartford town council was empowered to " 'attach any conditions to its approval [of a special development district plan] as it considers necessary in order to assure continued conformance to the approved plan and zoning regulations . . . .' " (Brackets in original.) Id., quoting West Hartford Code of Ordinances § 177-44.C (4).

tions must be uniformly applied throughout each district. We disagree with the commission's arguments and conclude that the evidentiary standard enunciated in *West Hartford* applies to this case.

As a general matter, we may assume that zone changes may be conditionally granted only when regulations authorize conditions to be imposed in specific circumstances, and when the regulations are uniformly applied. See *Bartsch* v. *Planning & Zoning Commission*, 6 Conn. App. 686, 690–91, 506 A.2d 1093 (1986); see also *Summ* v. *Zoning Commission*, 150 Conn. 79, 85–86, 186 A.2d 160 (1962); *Pecora* v. *Zoning Commission*, 145 Conn. 435, 441, 144 A.2d 48 (1958). A general rule requiring uniform regulations serves the interests of providing fair notice to applicants and of ensuring their equal treatment. See *Bartsch* v. *Planning & Zoning Commission*, supra, 689; see also *Veseskis* v. *Zoning Commission*, 168 Conn. 358, 360, 362 A.2d 538 (1975). It is not necessary to apply such a rule to this case, however, because the interests served by the rule would not be adversely implicated by granting the zone change on the condition that the new zone be used only for affordable housing. The plaintiff has not complained of lack of notice that the newly created zone could be used only for affordable housing. The plaintiff's application itself stated the purpose of the desired zone; his testimony before the commission confirmed his intent to use the zone for affordable housing; and the filing of his appeal from the commission's decision under § 8-30g constituted a judicial admission that the zone change was sought "in connection with an affordable housing development." General Statutes § 8-30g (a) (2). Moreover, allowing a conditional approval of the plaintiff's application does not discriminate among similarly situated applicants for zone changes. Affordable housing applicants, unlike

other zone change proponents, may invoke specific appellate rights pursuant to § 8-30g *because* they will use the new zones to build affordable housing.

We conclude, therefore, that whatever the commission's regulatory authority may be in other circumstances, it can condition its granting of an affordable housing zone change application on the use of the new zone only for affordable housing.[15] The trial court's order of remand will afford the commission the opportunity to craft an appropriate condition in this case.[16] The scope of the commission's authority is therefore indistinguishable from that which governed our decision in *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, supra, 228 Conn. 524–25. The trial court properly determined that § 8-30g applies to the plaintiff's appeal.

### III

The commission maintains that, even if § 8-30g applies, it was justified in denying the plaintiff's application for a zone change. The commission argues that the trial court improperly rejected two separate justifications for the commission's decision by: (1) imposing upon it too high an evidentiary burden; and (2) mischaracterizing the substantive evidence in the record. We agree with the commission's argument about the evidentiary burden, but we disagree with its contentions about the evidence in the record. We therefore affirm the judgment of the trial court.

---

[15] Of course, the condition imposed could require only as much as the affordable housing statute itself: that the zone would be revoked unless the units were built as "assisted housing" or at least 20 percent of the units were built as "deed restricted" housing, as defined in § 8-30g.

[16] The commission also will have the power to enforce the condition, if such enforcement becomes necessary, under the appropriate sections of the General Statutes. See, e.g., General Statutes §§ 8-3, 8-12.

## A

The commission first argues that the trial court improperly required it to show that there was "substantial" evidence in the record to support its denial of the plaintiff's application. The commission contends that the traditional principles governing appeals from legislative decisions of zoning commissions, as well as the terms of § 8-30g itself, require a commission only to show "sufficient" evidence in the record to support its decision. Although it is not entirely clear whether the trial court applied the "substantial" evidence test in this case,[17] we will exercise our supervisory authority to review this issue.[18] We agree with the commis-

[17] In a section of its memorandum of opinion entitled "The Scope of Review," the trial court stated that "[b]oth the plaintiff and the defendant agree for the purpose of this appeal that 'sufficient evidence' means the same as 'substantial evidence' as defined by our Supreme Court in *Huck* v. *Inland Wetlands & Watercourses Agency*, 203 Conn. 525, 539 [525 A.2d 940] (1987). In its brief, the defendant acquiesces in the application of this standard because it believes that it has sustained its burden of proof under the statute but suggests nevertheless that it may not be the correct standard. This court likewise perceives that other possible interpretations exist but that this case is not an appropriate vehicle in which to make that determination."

After this brief statement, the trial court did not again refer either to the "substantial evidence" standard or to our analysis in *Huck* v. *Inland Wetlands & Watercourses Agency*, supra, 203 Conn. 539. Moreover, the trial court rejected the commission's arguments not for lack of "substantial" evidence in the record, but for lack of *any* evidence in the record. On the basis of both the trial court's express statement that "this case is not the appropriate vehicle in which to" analyze the proper evidentiary standard and the contents of its analysis, we conclude that the trial court would have held that there was not "sufficient evidence" in the record even under the narrower test we describe in the following text.

[18] Because we are exercising our supervisory authority to review the evidentiary standard imposed, we need not directly address the plaintiff's contention that the commission waived its right to challenge the evidentiary standard by acceding to the application of that standard. *State* v. *Patterson*, 230 Conn. 385, 397, 645 A.2d 535 (1994); *State* v. *Smith*, 207 Conn. 152, 162–64, 540 A.2d 679 (1988).

sion that the correct test is whether it met the lesser burden of adducing "sufficient evidence" to support its decision.

In traditional zoning appeals, the scope of judicial review depends on whether the zoning commission has acted in its "legislative" or "administrative" capacity. "The discretion of a legislative body, because of its constituted role as formulator of public policy, is much broader than that of an administrative board, which serves a quasi-judicial function." (Internal quotation marks omitted.) *Protect Hamden/North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Commission*, 220 Conn. 527, 543, 600 A.2d 757 (1991); *Malafronte* v. *Planning & Zoning Board*, 155 Conn. 205, 209, 230 A.2d 606 (1967). "Acting in such legislative capacity, the local [zoning] board is free to amend [or to refuse to amend] its regulations whenever time, experience, and responsible planning for contemporary or future conditions reasonably indicate the need for [or the undesirability of] a change. . . . Zoning must be sufficiently flexible to meet the demands of increased population and evolutionary changes in such fields as architecture, transportation, and redevelopment. . . . The responsibility for meeting these demands rests, under our law, with the reasoned discretion of each municipality acting through its duly authorized zoning commission. . . ." (Citations omitted; internal quotation marks omitted.) *Protect Hamden/North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Commission*, supra, 543–44; *Malafronte* v. *Planning & Zoning Board*, supra, 208–209. "In contrast, when acting in an administrative capacity, a zoning commission's more limited function is to determine whether the applicant's proposed use is one which satisfies the standards set forth in the [*existing*] regulations and the statutes." (Emphasis added; internal quotation marks omitted). *West Hart-*

*ford Interfaith Coalition, Inc.* v. *Town Council,* supra, 228 Conn. 505–506 n.10. In fulfilling its administrative function, a zoning commission is less concerned with the development of public policy than with the correct application of law to facts in the particular case.

These well established principles are reflected in the evidentiary rules governing appeals from zoning decisions. Appeals from legislative zoning decisions require a showing that the commission has acted "arbitrarily . . . illegally . . . or in abuse of discretion." (Internal quotation marks omitted.) *Protect Hamden/North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Commission,* supra, 220 Conn. 543–44. Legislative decisions "reached by [a zoning] commission must be upheld by the trial court if they are reasonably supported by the record. . . ." (Brackets in original; internal quotation marks omitted.) *West Hartford Interfaith Coalition, Inc.* v. *Town Council,* supra, 228 Conn. 513; *Calandro* v. *Zoning Commission,* 176 Conn. 439, 440, 408 A.2d 229 (1979). In appeals from administrative zoning decisions, by contrast, the decisions will be invalidated even if they were reasonably supported by the record, if they were not supported by "substantial" evidence in that record. *Huck* v. *Inland Wetlands & Watercourses Agency,* 203 Conn. 525, 540, 525 A.2d 940 (1987); see also *American Paper Institute* v. *American Electric Power Service Corp.,* 461 U.S. 402, 412 n.7, 103 S. Ct. 1921, 76 L. Ed. 2d 22 (1983); 1 K. Davis & R. Pierce, Jr., Administrative Law Treatise (1994) pp. 332–33. The "substantial evidence" standard requires enough evidence "to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. . . ." (Internal quotation marks omitted.) *Huck* v. *Inland Wetlands & Watercourses Agency,* supra, 541.[19]

---

[19] We do not here attempt exhaustively to analyze the difference between the two standards of review. As the United States Court of Appeals for

Nothing in the language, legislative history or policy of § 8-30g demonstrates an intent to apply the more stringent evidentiary standard derived from appeals of administrative zoning decisions to appeals from legislative zoning decisions. Section 8-30g specifies an evidentiary standard only as to one part of the commission's four part burden on appeal, requiring that "the decision . . . [b]e supported by *sufficient* evidence in the record . . . ." (Emphasis added.) General Statutes § 8-30g (c) (1); cf. General Statutes § 8-30g (c) (2) through (4) (not specifying evidentiary standard). Significantly, the legislative history suggests that the legislature chose to impose a "sufficient evidence" standard specifically because it thought that standard would be lower than the administrative "substantial evidence" standard.[20]

---

the Seventh Circuit has recognized, "an agency determination must have *some* evidentiary basis to avoid being held 'arbitrary and capricious' . . . [but t]he difference between 'some' and 'substantial' probably cannot be precisely stated except in the context of particular cases." (Emphasis in original.) *Aman* v. *Federal Aviation Administration*, 856 F.2d 946, 950 n.3 (7th Cir. 1988).

[20] See 32 S. Proc., Pt. 12, 1989 Sess., p. 4048, remarks of Senator Richard Blumenthal; 32 H.R. Proc., Pt. 30, 1989 Sess., p. 10619, remarks of Representative William J. Cibes, Jr.; compare original House Bill 7270, 1989 Sess. (requiring commission to show "substantial evidence in the record"), with Amendment "A" to House Bill 7270, 1989 Sess., reprinted in 32 H.R. Proc., Pt. 30, 1989 Sess., p. 10684 (requiring only "sufficient evidence in the record").

Indeed, the only legislator who spoke on the record to define the "sufficient evidence" standard explained that the test was the same one used in the traditional review of legislative zoning decisions. As Representative Richard D. Tulisano explained, the term "sufficient evidence" in § 8-30g means "[e]nough evidence for one to reach a particular conclusion. . . . [A]s the body knows . . . court decisions have in fact left it to the findings . . . of the Boards of Planning and Zoning Commissions . . . . I think that they will have to have something on the record that third parties can look at in an objective manner and reach the same conclusion. It is not a very high standard whatsoever, and so I think the Representative is correct that [it] is just a matter of fact that something has to be there

In this case, when the commission rejected the proposed amendment to its zoning map, the commission was acting in its legislative capacity. *West Hartford Interfaith Coalition, Inc.* v. *Town Council,* supra, 228 Conn. 505 n.10; *Burnham* v. *Planning & Zoning Commission,* 189 Conn. 261, 265, 455 A.2d 339 (1983). In the appeal from the commission's decision, therefore, neither our traditional rules nor § 8-30g itself required the commission to demonstrate "substantial evidence" in support of its decision. The commission's only burden was to show that "the record before the [commission] support[ed] the decision reached"; *West Hartford Interfaith Coalition, Inc.* v. *Town Council,* supra, 513; and that the commission did not act "arbitrarily . . . illegally . . . or in abuse of discretion." (Internal quotation marks omitted.) *Protect Hamden/North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Commission,* supra, 220 Conn. 543–44.

## B

Applying this standard to the evidence of record before the commission, the commission contends that, in two respects, the trial court improperly overturned the commission's denial of the plaintiff's application. The commission maintains that the record contains sufficient evidence to sustain its determination that the application: (1) would create environmental problems because of the risk of a "considerable impact on the Lake Kenosia watershed"; and (2) would create traffic problems because of the intensity of use of the proposed development and because there was no evidence

and they will have sustained their burden." 32 H.R. Proc., Pt. 30, 1989 Sess., p. 10579.

Because the question is not here presented, however, we express no opinion as to whether the legislature intended courts to apply the lower "sufficient evidence" standard in appeals from *administrative* zoning decisions, and if so, whether it intended courts to do so in all or only some aspects of such appeals.

that other agencies would approve the road work necessitated by such intensity of use.[21] We are not persuaded by either argument.

To justify its denial of the plaintiff's affordable housing application, the commission was required to show that, on the basis of "the evidence in the record . . . the decision [was] necessary to protect substantial public interests . . . ." General Statutes § 8-30g (c) (2). Section 8-30g (c) (2) therefore imposed two burdens on the commission. First, the commission was required to establish that it reasonably could have concluded that "substantial public interests" were implicated by the zone change, in light of the record evidence as to both the level of harm that could result from the zone change and the probability that the zone change would cause that harm. Second, the commission was required to establish that, on the basis of the record, it reasonably could have concluded that the decision to deny the zone change was "necessary"—i.e., that any such public interests could not be protected if the zone change were granted. We agree with the trial court that the commission failed to satisfy its burdens.

1

We first examine the commission's contention, which the trial court rejected, that the zone change would threaten the Lake Kenosia watershed. The commission challenges the decision of the trial court in three respects. First, it argues that the trial court improperly required evidence that the zone change would result in a "definite or reasonably likely harm" to the

[21] The commission conceded in its appellate brief that it had failed to sustain its burden of proof under § 8-30g as to its first reason, namely that the land "was in the plan of development as a[n] RA-40 zone and it should remain that way." Moreover, the commission has provided no arguments in support of its fourth concern—the "need to preserve the neighborhood as it presently exists"—other than its arguments about the need to protect the Lake Kenosia watershed.

watershed, when the commission merely needed to show record evidence that the harm was a "possibility." Second, it argues that the trial court improperly gave too much weight to the fact that the "expert evidence" supported the plaintiff's application, because the commission had not been required to find that evidence credible. Finally, it argues that the trial court improperly determined, on the basis of the record, that the zone change denial had not been necessary to protect the watershed. Although we agree in part with two of the commission's three arguments, we are nevertheless persuaded that, as the trial court concluded, the record does not support the commission's decision.

First, the commission argues that the trial court applied an incorrect standard by requiring a showing that the proposed zone change would lead to "definite or reasonably likely" harm, when the law entitled the commission to reject an application even if the harm was merely "possible." In particular, the commission challenges the trial court's reliance on an earlier statement of this court that "[c]ertainly a local legislative body may consider the effects that are *likely* to flow from proposed amendments to its zoning regulations, and may decide, within the proper statutory parameters, that it would be unwise policy for the town to countenance those effects." (Emphasis added.) *Protect Hamden/North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Commission*, supra, 220 Conn. 548. The commission argues that, contrary to the analysis of the trial court, the quoted language does not mean that a commission may consider *only* "effects that are likely . . . ." Id. Rather, the commission argues, quoting the immediately preceding sentence of this court's opinion, a zoning commission also is "entitled . . . to consider [a proposal's] *potential* effects on the town . . . ." (Emphasis added.) Id.

We agree with the commission that a zoning authority, acting in its legislative capacity, is not limited to considering only the effects of its actions that are definite or more likely than not. *Connecticut Resources Recovery Authority* v. *Planning & Zoning Commission*, 225 Conn. 731, 756, 626 A.2d 705 (1993) (holding that commission reasonably could reject zoning amendment because of "risks" of environmental degradation); see also *Huck* v. *Inland Wetlands & Watercourses Agency*, supra, 203 Conn. 549 (upholding agency decision to deny wetland permit because, inter alia, "the record does contain evidence that there *could* be pollution" [emphasis added]). We disagree, however, that the commission was entitled to reject this plaintiff's application based on the mere possibility that the zone change would harm the Lake Kenosia watershed. As we explained above, the commission was required to show a reasonable basis in the record for concluding that its decision was necessary to protect substantial public interests. The record, therefore, must contain evidence concerning the potential harm that would result if the zone were changed from RA-40 to RA-8 and concerning the probability that such harm in fact would occur.

The commission next argues that the trial court improperly gave too much weight to the fact that all the "expert evidence" in the record supported the plaintiff's application. We agree with the commission that it was not required to give credence to any witness, including an expert. *Huck* v. *Inland Wetlands & Watercourses Agency*, supra, 203 Conn. 542. We also assume without deciding that the commission was entitled to reject this application on the basis of its own members' testimony or the testimony of other lay witnesses, without additional expert testimony.[22] Although the com

[22] In *Feinson* v. *Conservation Commission*, 180 Conn. 421, 427, 429 A.2d 910 (1980), we considered the question of "whether, on a subject as tech

mission would have been entitled to deny an application because it did not believe the expert testimony, however, the commission had the burden of showing evidence in the record to *support* its decision not to believe the experts—i.e., evidence which undermined either the experts' credibility or their ultimate conclusions. See generally *Huck* v. *Inland Wetlands & Watercourses Agency*, supra, 544–50. Moreover, in the absence of expert testimony, the commission was required to point to other probative evidence in the record showing that the zone change implicated substantial public interests. General Statutes § 8-30g (c).

Bearing in mind that the commission bore the burden of establishing, with or without expert evidence, that the zone change threatened substantial public interests, we now turn to the evidence of record to determine whether the trial court properly ruled, on

nically sophisticated and complex as pollution control, commissioners who have not been shown to possess expertise in this area may rely on their own knowledge, without more, in deciding to deny a license to conduct a regulated activity." We noted that "[t]he question in this precise form is one that we have not previously had the occasion to consider. We have in the past permitted lay members of commissions to rely on their personal knowledge concerning matters readily within their competence, such as traffic congestion and street safety . . . and local property values. . . . We [also] have permitted a commission composed of experts to rely on its own expertise within the area of its professional competence . . . but in that case we recognized as well that expert testimony may be required when the question involved goes beyond 'the ordinary knowledge and experience' of the trier of fact." (Citations omitted.) Id., 427–28. After setting out the question presented in *Feinson*, however, we went on to resolve the case without answering it. We held that even if the commission had been entitled to rely on its own knowledge and experience, it had been required "to reveal publicly its special knowledge and experience, to give notice of the material facts that are critical to its decision, so that a person adversely affected thereby has an opportunity for rebuttal at an appropriate stage in the administrative proceedings." Id., 428–29. We therefore sustained the plaintiff's appeal in that case on the limited ground that the plaintiff had not been "afforded a fair opportunity to hear the commission's fears and to attempt to allay them." Id., 428.

the basis of that record, that the commission had failed to carry its burden. We agree with the trial court that the record does not support the commission's decision.

As the trial court properly determined, the record contains the following evidence. "The City Superintendent of Public Utilities, William Buckley, testified that both public utility water and municipal sewerage facilities were readily available to the site. This obviated any risk associated with either degradation of the underground water supply by the installation of on site wells or contamination of the Lake Kenosia watershed as a result of underground leaching of septic effluent. . . . He concluded that the plaintiff's proposal would not threaten the water supply any more than it is threatened by the kind of activities that are already there.

"Jack Kozuchowski, the City Environmental Coordinator, advised the commission that requiring that the sewers be placed on both the north and south side of the property 'would reduce the nutrient loading on the lake which is really relevant to the commission's interest and would eliminate many of the problems.' Although it does not appear as part of any of the reasons, the principal concern of the commission appeared to be the possible harmful effect on the lake caused by nutrient loading from the development. The issue was explored extensively at the hearings.

"Henry Moeller, a soil scientist, called by the plaintiff, testified that 'essentially all practical and suitable measures have been incorporated into this project to protect the wetlands soils and also the water quality coming off the property.' He further opined that because the developer could be required to install detention basins to catch most of the nutrients, the flow [off] the property would be less than it is now. He said that 'even with the [worst] case of an overwatered, highly

fertilized lawn, that the total nitrogen in both surface runoff and subsurface seepage coming from the plot, the amount of nitrates in the water in terms of concentration remain below drinking water standards.'

"Jeanne Williamson, the plaintiff's engineer . . . testified that she was 'confident that the plan will protect the . . . wetlands and therefore discharge no phosphates to the downstream receiving watercourses.' She stated that 'with the erosion and sedimentation controls and storm water management practices proposed and previously approved by the Environmental Impact Commission, this project will have no adverse impact upon Lake Kenosia. The impact upon Lake Kenosia from this property will be reduced [compared to its undeveloped state] by lessening the amount of siltation from the site with erosion and sedimentation control measures and detention/sedimentation basins.'

"Sometime in the middle 1980's the City of Danbury created the Lake Kenosia Commission to protect the lake. . . . Through its chairperson, R. A. Carlson, it recommended against approval of the initial application but did not take a formal position with respect to the modified application. The recommendation is found in a letter dated November 12, 1991, in which the commission advised that the 'increased potential housing density *can* have a significant adverse impact on surface and ground water quality of the Kenosia Aquifer Watershed.' (Emphasis added.) The chairperson attached reports and correspondence which generally discuss conditions in the watershed and lake. The commission did not submit a report relating specifically to the plaintiff's development proposal nor did it offer any expert testimony. In fact it failed to point to any definite or even reasonably likely harm that . . . would befall the lake and its watershed. Not only was the fear generalized but it was highly problematical. No effort was made to evaluate the modified proposal."

The commission contends that two aspects of the record support its decision to deny the zone change. First, the commission focuses on the letter and documents submitted by the Lake Kenosia commission, which, according to the commission, tended to show that "increased potential housing density can have significant adverse impact on surface and groundwater quality of the Kenosia aquifer watershed." Second, the commission points to a document in the record that the trial court did not explicitly address, a 1989 draft of the Danbury watershed protection plan. Specifically, the commission quotes the section of the watershed protection plan that sets out a "hierarchy of low to high risk land use categories based on the potential for contaminating" ground water and surface water. In this "hierarchy," the watershed protection plan characterizes "medium density residential (density ranges from one dwelling unit per 1/2 acre to one unit per 2 acres)" as a "slight to moderate risk," but characterizes "high density residential (more than one dwelling unit per 1/2 acre site)" as a "substantial risk." The commission also contends that the watershed protection plan contradicted the testimony that sewers could be used to avoid the risks of the development, because that document contained a general recommendation that sewers not be extended into watershed areas.

We agree with the trial court that none of the evidence from the Lake Kenosia commission provided a reasonable basis on which to deny the application. That agency's letter did not express an opinion either as to how great an effect the zone change would have or as to the probability that the effect would occur. None of the documents presented by that agency, moreover, provides any reasonable basis for the conclusion that a change to the RA-8 zone, allowing construction of five houses per acre, would be more harmful than the existing RA-40 zone, allowing construction of one house

per acre. Although the documents suggest that any development in the watershed may cause harm, the documents do not support the commission's assumption that higher density development would be more harmful than lower density development.[23]

Similarly, we agree with the trial court that the watershed protection plan provided *no reasonable basis* for the commission's conclusion. Immediately before setting out its "hierarchy" of land use risks, that document explicitly cautions that "this hierarchy is not based upon empirical data but on subjective judgment. Therefore, it . . . should not be used as a regulatory framework without further research or evaluation." Because the record contains no "further research or evaluation" comparing the environmental effects of the current RA-40 zone to the proposed RA-8 zone, the watershed protection plan's hierarchy, by its own terms, had no probative value. In addition, the watershed protection plan's general recommendation against sewers was irrelevant to this case. As the trial court found, all the testimony in the record indicated that "Lake Kenosia is an *exception* to the sewer avoidance policy of the city because the Lake Kenosia watershed is already occupied by uses which are 55% industrial or commercial" (emphasis added) and because the use of sewers would actually decrease the nutrient loading and resulting eutrophication of the lake.

---

[23] The commission was particularly precluded from making such an assumption in light of the other evidence in the record that the denser zone would in some ways cause a smaller environmental impact. The plaintiff's engineer, for example, testified that because the denser zone would include smaller houses and require fewer roads and shorter driveways, the total "impervious surface area" in the RA-8 zone would be slightly *less* than that in the RA-40 zone. The plaintiff's engineer further explained that a reduction in impervious surface area allowed for more absorption and filtration of waste products. Additional evidence in the record showed that the higher density development, which would require the installation of sewers, would be less harmful than a lower density development that relied on septic systems.

In sum, we agree with the conclusion of the trial court that "there is nothing in the record that supports anything but a mere possibility" that the requested zone change would harm the environment. The record contains no evidence quantifying the potential level of harm to the Lake Kenosia watershed or estimating the probability that the harm would occur if the zone change were granted. We agree, therefore, that the commission failed to carry its burden to show that its decision was necessary to protect substantial public interests in the Lake Kenosia watershed.

2

The commission argues, in the alternative, that the evidence of record supports its decision to deny the application because the affordable housing development would cause too much traffic on existing roads. The trial court rejected this argument in part because it determined that the record before the commission showed that the traffic problem could be solved if one or more existing roads were improved. The commission does not dispute the potential viability of this solution to the traffic problem. The commission argues, rather, that because the *planning* commission has sole jurisdiction to approve road improvements, and because there was no evidence in the record that the planning commission would approve the new roads, protection of the public interest in traffic control required a denial of the plaintiff's zone change application. See General Statutes § 8-30g (c) (2). We are not persuaded.

The commission bases its argument on *Faubel* v. *Zoning Commission*, 154 Conn. 202, 224 A.2d 538 (1966), in which, on somewhat similar facts, this court held that "a change of zone which is dependent for its proper functioning on action by other agencies and over which the zoning commission has no control cannot be sustained unless . . . the necessary action appears to be

a probability." Id., 211. This holding reflects the policy concern that, in the face of evidence of impending harm to the public interest, zoning commissions should not grant zone changes without assurances, in the record, that preventive steps will be taken to minimize the risk of harm. See also *Brustein* v. *Zoning Commission*, 151 Conn. 101, 105, 193 A.2d 523 (1963); *Luery* v. *Zoning Board*, 150 Conn. 136, 145, 187 A.2d 247 (1962); *Whalen* v. *Town Plan & Zoning Commission*, 146 Conn. 321, 326–27, 150 A.2d 312 (1959); *Gordon* v. *Zoning Board*, 145 Conn. 597, 603–604, 145 A.2d 746 (1958).

The concerns that underlay *Faubel* do not, however, control the decision in this case if the commission has the authority to grant the application for a new zone on the condition that the planning commission approves, and the plaintiff makes, the necessary road improvements. If the roads are not built, the existing zone will continue in place, and the public interests in traffic control will remain protected. If the roads are built, on the other hand, the public interests in traffic control will not be adversely affected. In other contexts, therefore, we have allowed zoning commissions to approve a proposed development project on the condition that the applicant take other action, even when the other action required another agency's approval, and even when there was no "evidence that the other agency will act favorably on the future request." *Blaker* v. *Planning & Zoning Commission*, 212 Conn. 471, 482, 562 A.2d 1093 (1989); *Lurie* v. *Planning & Zoning Commission*, 160 Conn. 295, 278 A.2d 799 (1971).

The commission maintains, nevertheless, that it is not empowered conditionally to grant this zone change application because, in our prior cases, the conditional zoning approvals that we allowed did not involve *zone changes*.[24] The commission argues, further, that even

[24] In *Lurie* v. *Planning & Zoning Commission*, supra, 160 Conn. 307, we held only that "where *an exception or a special permit* is granted and the

if it had been empowered *conditionally to grant* the zone change to protect the public interests, it also was empowered simply *to deny* the zone change to protect those interests. In the context of an application to build affordable housing, however, we agree with the trial court that, on the present record, the conditional granting of a zone change was not only authorized but required.

As long as a conditional zone change approval protects the public interest in traffic control, a proposition that the commission does not contest, such an approval advances the legislative purpose of encouraging the construction of affordable housing. " '[P]ublic officials are expected to cooperate in helping [affordable housing] to [be] locate[d] in their community' . . . but it is hardly reasonable to expect that a highway authority or traffic authority would make the necessary expenditures and changes without knowing that when such work was completed the . . . zoning commission would approve and permit the project which the work was designed to make possible, nor, logically, should the commission grant an unconditional permit for a project when in its judgment the project was impermissible unless off-site work were done. In such circumstances it is entirely reasonable and logical that the . . . zoning commission which is entrusted with large powers . . . should be the agency to make the

---

grant is otherwise valid except that it is made reasonably conditional on favorable action by another agency or agencies over which the zoning authority has no control, its issuance will not be held invalid solely because of the existence of any such condition." (Emphasis added.) Cf. *Blaker* v. *Planning & Zoning Commission*, supra, 212 Conn. 471 (upholding without discussion conditions that had been attached to simultaneous applications for special permit and zone change). Indeed, in *Lurie*, we allowed zoning commissions to grant special permits and exceptions on the condition that other agencies act favorably in part because zoning commissions already were entitled to impose other types of ad hoc conditions in connection with special exceptions and special permits. *Lurie* v. *Planning & Zoning Commission*, supra, 304–306.

first move and the decision as to the conditions under which it would approve the [project]. This is so even though the project may subsequently fail to materialize because one or more of the conditions has for any reason not been met." (Citations omitted.) *Lurie* v. *Planning & Zoning Commission*, supra, 160 Conn. 306–307.

In principle, this issue is no different from that which we considered, earlier in this opinion, about the authority to condition any change in zone for the plaintiff's property on the actual use of that property for affordable housing. The plaintiff had adequate notice that the road improvements, which he agreed were necessary, would require planning commission approval; see footnote 13; and there has been no argument that conditioning the zone change on approval and implementation of the road improvements would discriminate against the plaintiff's application. Indeed, the plaintiff conceded in his brief to this court that it would be fair and appropriate to allow the commission in this case to impose a condition on the zone change that incorporated the relevant traffic concerns.

The conclusion that the commission was empowered to grant the plaintiff an appropriately conditioned zone change does not, of course, demonstrate that the commission was, as the trial court held, required to do so. In our past cases approving conditional zoning, we have described conditional zoning not as an obligation, but as a means of achieving "greater flexibility in zoning administration . . . ." *Blaker* v. *Planning & Zoning Commission*, supra, 212 Conn. 482.

In light of the statutory requirements of § 8-30g and the specific facts presented in this case, however, we conclude that the trial court's holding was proper. For the commission to demonstrate that its denial of the

plaintiff's affordable housing application had been "necessary to protect substantial public interests"; General Statutes § 8-30g (c) (2); the commission was required to show that, on the basis of the evidence in the record, it reasonably could have concluded that it could not simultaneously grant the zone change and protect the public interest. In this case, however, all the evidence in the record showed that the potential traffic problem would be solved by making certain road improvements. The plaintiff, furthermore, agreed to make those improvements. On this record, therefore, the commission's decision to deny the zone change was not "necessary to protect substantial public interests." General Statutes § 8-30g (c) (2).

In sum, we affirm the conclusion of the trial court that the commission failed to prove, on the evidence in the record, that its denial of the plaintiff's affordable housing application was necessary to protect substantial public interests.[25] In accordance with the judgment of the trial court, the case will be remanded to the commission, with direction that "the modified

---

[25] Because we affirm the trial court's conclusion that the commission failed to meet its burdens under § 8-30g (c) (2), we need not address the commission's argument that the trial court also improperly determined that the commission had failed to meet its burdens under § 8-30g (c) (3). The commission contends that, in determining if "the public interests" clearly outweighed the "need for affordable housing" pursuant to § 8-30g (c) (3), the trial court improperly looked to the statewide need for housing, rather than to "the need for affordable housing" in Danbury itself. We offer no opinion, however, as to the propriety of the commission's argument, as to how the "need for affordable housing" should be defined, or as to the kind of evidence, if any, that would suffice to show that there was less "need" for affordable housing in a particular place. See also *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, supra, 228 Conn. 521–22 n.23 (reserving question of "whether, under § 8-30g [c], the need for affordable housing should be assessed on a regional or local basis, or assessed generically in the manner that other balancing tests in our law have been analyzed"); id., 530 (*Berdon, J.*, concurring) (arguing that "need" for housing is "the generalized need for affordable housing that exists statewide").

application be approved under such terms and conditions as the commission might reasonably prescribe within the parameters of" the trial court's ruling.

The judgment is affirmed.

In this opinion the other justices concurred.