[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
On October 15, 1993 the Dime Savings Bank (hereinafter "Applicant") filed an application for a zone change with the defendant Durham Planning and Zoning Commission (hereinafter "Commission") with regard to 82 acres of property it owns. The property presently lies in the DD, Design Development zone. The application requested that the zone be changed to FR, Farm Residential. The application further stated that it was submitted to allow the property to be developed as an affordable housing project pursuant to Connecticut General Statutes section 8-30g.
The DD zone allows "office industrial park and commercial development." (No. CV 94-0536677, ROR Item 55, sec. 07.04). The Farm Residential Zone is one of two residential zones in Durham, the other being Main Street Residential. (Id. sec. 5.01.01).
The Commission held a public hearing on the application and on February 2, 1994 the Commission denied the request for a zone change. The action of the Commission is the subject of appeal No. CV 94-0536677 (hereinafter "No. 6677"). The reason for the Commission's denial were as follows:
 1. It is the Commission's contention that the above referenced application does not qualify as an "affordable housing application" pursuant to the provisions of S8-30g(c) of the General Statutes. No application has been presented to the Commission seeking to develop this parcel of land, although a conceptual plan was presented to the Commission as an illustration of the manner in which the land might be developed. However, no formal review or approval was requested of the Commission by the applicant. There is simply no development proposal before the Commission at this time to which it can react.
 2. Preservation of the small amount of available industrial/commercial property that is appropriately located and zoned is of overriding public interest for the entire population of Durham. At the present time, 5.3% of the total land area of the Town of Durham is zoned for commercial/industrial use. In contrast, 94% of the total land CT Page 10528 area of the town is presently zoned Farm Residential. The proposed zone change, if approved by the Commission, will decrease the amount of land available for commercial/industrial use by 10%.
 3. The reasons assigned by the Commission for designating this particular parcel of land as light industrial in 1986 and later as Design Development were (1) create a residential or light industrial buffer around the existing dwellings along the south side of Route 68 and the west side of Old Mountain Road; (2) allow Tilcon to expand its operations to the south on its property, thus permitting the mining operation to move away from the existing dwellings insuring their viability; (3) prevent further conflicts between potentially expensive residential properties and the Tilcon mining operation; (4) eliminate potential future conflicts between future industrial uses and existing residential uses north of Commerce Circle along Route 157: (5) use property boundaries and natural features to establish zone boundaries; and (6) provide for future industrial growth to help balance the housing growth generated by employment opportunities in the I-91 corridor. These reasons still exist and are valid.
 4. The land in question zoned "Design Devlopment [Development]" is uniquely situated for direct access to state highways, which leads to the Route 91 expressway and existing railroad tracks for railroad service. This unique situation does not occur anywhere else in Durham.
On February 18, 1994 within the time permitted by section8-30g(d), the applicant submitted an application for approval of a subdivision, together with a site plan, as a proposed modification. This was its response to the objection articulated by the commission that the original application lacked a development proposal. (Reason 1). On March 22, 1994 the modified application was denied. This denial is the subject of appeal No. CV 94-0536676 (hereinafter "No. 6676"). The reasons for denial were virtually the same except for Reason No. 1. The first reason stated as follows: "It is the Commission's contention that the above referenced application does not qualify as an `affordable housing application' pursuant to the provisions of Sec. 8-30g(c) of the General Statutes."
In both appeals the Applicant alleges that the Commission acted illegally, and arbitrarily. CT Page 10529
On July 7, 1994, the motion of the West Side Property Owners to intervene as Party Plaintiff was granted.
The Affordable Housing Land Use Appeals Act, codified in General Statutes, Sec. 8-30g, became effective in 1990. The Act modifies the procedure of judicial review of certain land use appeals to the Superior Court. The land use appeals affected by section 8-30g are those in which the development proposed includes a certain percentage of affordable housing as defined by the Act.
An affordable housing development is defined as a "proposed housing development (A) which is assisted housing or (B) in which not less than twenty per cent of the dwelling units will be conveyed by deeds containing covenants or restrictions which shall require that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing as defined in section8-39a, for persons and families whose income is less than or equal to eighty per cent of the area median income, for at least twenty years after the initial occupation of the proposed development. . . ." (General Statutes, Sec. 8-30g (a)(1).)
Section 8-30g(a)(2) provides that "`an affordable housing application'" means any application made to a commission in connection with an affordable housing development by a person who proposes to develop such affordable housing. . . ."
The Act permits an appeal by "[a]ny person whose affordable housing application is denied or is approved with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units. . . ." Sec. 8-30g(b).
Section 8-30g(b) also states that "[e]xcept as otherwise provided in this section, appeals involving an affordable housing application shall proceed in conformance with the provisions of . . . section[s] 8-8. . . ." Under traditional zoning appeals practice there must be an aggrieved party in order for the court to have jurisdiction to hear the appeal. The party claiming aggrievement must demonstrate a specific personal and legal interest in the subject matter of the decision as distinguished from a general interest, such as is the concern of all members of the community as a whole. In addition, the party must establish that this specific personal and legal interest has been specially and injuriously affected by the decision. Walls v. Planning Zoning Commission,176 Conn. 475, 478, 408 A.2d 252 (1979). CT Page 10530
Peter Kofsuske, Vice-President of Dime Savings Bank of Wallingford, which filed both applications, testified that the bank took title to the subject property by virtue of a certificate of foreclosure. (Plaintiff's Exhibit 1). The court finds that Dime Savings Bank is the owner of the property. The owner of the property which forms the subject matter of the application is always aggrieved. Bossert v. Norwalk, 157 Conn. 279, 285,253 A.2d 39 (1968). Therefore, the applicant has fulfilled the requirement of aggrievement. In addition, the applicant is within the definition of "any person" under section 8-30g.
Once the appeal is taken, the burden of proof of traditional zoning practice, which rests on the appellant, no longer applies. Section 8-30g(c) provides as follows:
 Upon an appeal taken under subsection (b) of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission that (1) the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record: (2) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (3) such public interests clearly outweigh the need for affordable housing; and (4) such public interests cannot be protected by reasonable changes to the affordable housing development. If the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it.
The reasons for the Commission's decision must be supported by "sufficient evidence" as to Sec. 8-30g(c)(1). Kaufman v. ZoningCommission, 232 Conn. 122, 152, 653 A.2d 798 (1995). The legislative history of the statute demonstrates the legislature's consideration of this evidentiary standard. In response to a colleague's question as to the meaning of sufficient evidence, and how it might relate to such standards as "fair preponderance of the evidence," "more probable than not," and "clear and convincing evidence," Representative Tulisano said, "[It is] enough evidence to reach a particular conclusion. It is in fact a new system we're developing here today. It is none of the three. . . . It is not a very high standard whatsoever . . . something has to be there and they will have sustained their burden. It is in fact a very easy thing to do)." 32 H.R. CT Page 10531 Proc, Pt. 30, 1989 Sess., p. 10578-10579. Later in the debate, Representative Cibes stated, "[T]he intention is to lower the burden of proof for the community, to lower the level of interest which is required." Id., 10620. Additionally, he said, "[t]he intent here it to ratchet down the level of interest that is required for the commission to demonstrate that it is correct." Id., 10621.
When a zoning commission acts in its legislative capacity, its conclusions must be upheld if they are reasonably supported by the record and the grounds "are pertinent to the considerations which the authority was required to apply under the zoning regulations. . . ."West Hartford Interfaith Coalition, Inc. v. Town Council, 228 Conn. 498,513, 636 A.2d 1342 (1994). "To justify its denial of the plaintiff's affordable housing application, the commission was required to show that, on the basis of `the evidence in the record . . . the decision [was] necessary to protect substantial public interests. . . .' General Statutes sec. 8-30g(c)(2). Section 8-30g(c)(2) therefore imposed two burdens on the commission. First, the commission was required to establish that it reasonably could have concluded that `substantial public interests' were implicated by the zone change, in light of the record evidence as to both the level of harm that could result from the zone change and the probability that the zone change would cause that harm. Second, the commission was required to establish that, on the basis of the record, it reasonably could have concluded that the decision to deny the zone change was `necessary' — i.e., that any such public interests could not be protected if the zone change were granted." Kaufman v. Zoning Commission,
supra, 154.
Inasmuch as the Commission gave virtually identical reasons in response to both applications, the court has considered both appeals together and, except for Reason No. 1, its findings apply to both appeals.
The first application, dated October 15, 1993, sought an "amendment to zoning boundary" from DD-Design Development to FR-Farm Residential." The application stated it was "submitted in order to allow the property to be developed as an affordable housing project in conformance with and pursuant to Connecticut General Statutes 8-30g relating to affordable housing projects." (No. 6676 and No. 6677, ROR Item 1).
Section 14.02 of the applicable Durham zoning regulations state that petitions for amendment of the zoning regulations or boundaries need be submitted in writing on a form prescribed by the CT Page 10532 commission. Section 14.03 requires a fee of $40 to accompany the petition. There is no requirement that such a petition need be accompanied by a subdivision application or site plan. (No. 6677, ROR Item 55).
In Kaufman v. City of Danbury, supra, 141, the Supreme Court concluded that "section 8-30g does not independently require an affordable housing developer to submit to the commission, at the time of his initial application in connection with an affordable housing development, any more detailed 'plans' than an applicant who requests a zone change for a purpose other than affordable housing. A zoning commission undoubtedly is entitled to enact regulations requiring all zone changes in connection with affordable housing developments, at the time their applications are filed, to submit information that the commission will need to fulfill its duties."
Since the commission did not enact regulations requiring zone change applicants to submit information it needed to fulfill its duties it could not impose such a requirement in connection with this first application.
The defendant and the intervening party argued that the applicant was not a "person who proposed to develop . . . affordable housing." Sec. 8-30g(a)(2).
The application specifically stated that it was submitted "in order to allow the property to be developed as an affordable housing project in conformance with and pursuant to Connecticut General Statute 8-30g relating to affordable housing projects." (No. 6676 and No. 6677, ROR, Item 1). In addition, both applications contained a proposed restrictive covenant in which the applicant was the "Grantor" and the "Town of Durham or such other governmental entity as it may designate" the Grantee." The proposed covenant stated that the "Grantor intends to develop the Property" as multi-family residential housing, and to provide that twenty percent of the dwelling units will be preserved as affordable for at least twenty years after the initial occupancy of the the development, pursuant to C.G.S. 8-30g and 8-39a hereinafter called the `Designated Units. . . .'"
The Connecticut Supreme Court found in Kaufman, supra, that a statement that the property was to be developed as an affordable housing project pursuant to the affordable housing statutes was "broad enough to embrace" both assisted housing or restricted housing under the statutes. In addition, the applicant in Kaufman had stated that "a minimum of twenty percent would be devoted to CT Page 10533 affordable housing as that term is defined by law." In the instant case, this court finds that the applicant was, at least as specific in its description of its purpose as the Kaufman court found Kaufman to be.
Accordingly, the court finds that the applications qualify as affordable housing applications. Therefore, the appeals are sustained as to the first reason for denial in each.
At the heart of the remaining reasons, is the extent, if at all, sec. 8-30g overrides the commission's legislative determination that a particular parcel lie within a certain zone when the commission's reasons for denial do not address the affordable housing proposal itself but the commission's reasons for the zone designation.
Reason 2 states as follows:
 2. Preservation of the small amount of available industrial/commercial property that is appropriately located and zoned is of overriding public interest for the entire population of Durham. At the present time, 5.3% of the total land area of the Town of Durham is zoned for commercial/industrial use. In contrast, 94% of the total land area of the town is presently zoned Farm Residential. The proposed zone change, if approved by the Commission, will decrease the amount of land available for commercial/industrial use by 10%.
 3. The reasons assigned by the Commission for designating this particular parcel of land as light industrial in 1986 and later as Design Development were (1) create a residential or light industrial buffer around the existing dwellings along the south side of Route 68 and the west side of Old Mountain Toad [Road]; (2) allow Tilcon to expand its operations to the south on its property, thus permitting the mining operation to move away from the existing dwellings insuring their viability; (3) prevent further conflicts between potentially expensive residential properties and the Tilcon mining operation; (4) eliminate potential future conflicts between future industrial uses and existing residential uses north of Commerce Circle along Route 157; (5) use property boundaries and natural features to establish zone boundaries; and (6) provide for future inudstrial [industrial] growth to help balance the housing growth generated by employment opportunities in the I-91 corridor. CT Page 10534 These reasons still exist and are valid
 4. The land in question zoned "Design Development" is uniquely situated for direct access to state highways, which leads to the Route 981 expressway and existing railroad tracks for railroad service. This unique situation does not occur anywhere else in Durham.
The applicant challenges the defendant's claim, as unsupported by the record, that there is an "overriding public interest" in maintaining the DD zone because the proposed zone change would decrease the amount of land available for commercial/industrial use in Durham by 10% from 5.3% of the total land area. The applicant claims that the 1981 Plan of Development identifies other parcels suitable for rezoning which the defendant failed to rezone; and, because the site cannot support the DD type of use, the public interest in the DD designation would not be protected.
The position paper submitted by the Maguire Group, Ct., Inc. (No. 6677, ROR Item 15, p. 3) states that the property tax contribution of the non-residential sector had decreased in 1992 from the previous year. While noting that the 1981 plan of development indicated a desire to reach a goal of 15% of the Grand List for commercial and industrial properties, the Maguire report does not indicate what other factors might have been implicated in the 1992 contribution which caused the decrease to 11% from the previous year. In addition, the report notes that the Midstate Regional Planning Agency reported that, of lands zoned for economic development approximately half the acreage, (an estimated 337 acres) is vacant, and an additional 350 acres belonging to Tilcon are vacant but "committed." Furthermore, two other areas are considered as having potential for rezoning to light industrial or DD zone but that rezoning would "most likely involve a long and difficult public process."
Additional reasons for not changing the zone, according to the Maguire report, include the possible application for a rezoning of the adjoining DD parcel, and the effect upon existing and "probable future residents" in the Farm Residential zone off Old Mountain Road."
The Maguire report submits a conceptual plan for the development of the subject site as a development park. However, all the material therein is speculative at best, without the specific and detailed site information which would emerge in the actual hearing CT Page 10535 process. Similarly, the estimates of the real property tax revenues are based upon assumptions and calculations untested in the heat of public hearings on a specific proposal.
The applicant's expert, Michelle Stroms, rebutted the Maguire report. She stated that there were significant vacancy rates at the two established industrial parks, Airline Park and Commerce Circle. These commercial/industrial areas are across Route 68 from the subject parcel. In Commerce Circle 53% of the land is available for development and there is a vacancy rate of 37%. (No. 6676, ROR Item 73, pp. 55 et seq.) In the Airline Park industrial development eight lots were expected to be subdivided or sold. Stroms stated that the subject property would take approximately six lots of two to four acres in size that would appeal to the "10 to 25,000 square foot user" but that such space was readily available already in Durham. (Id. p. 57). While Stroms agreed that Durham did not have the "long term potential" it needed, she believed that the subject parcel would not meet this need. (Id. pp. 57-58). She also stated that market conditions were not favorable for the selection of the subject site for industrial/commercial use in the foreseeable future. Hugh Curly, vice-president of the Middlesex County Chamber of Commerce and Chairman of the Economic Development Commission, stated that during the pendency of the application, he had received "at least 5 inquiries" regarding the availability of sites for the 10,000 or less square foot user. (No. 6676, ROR, Item 24, p. 40-41). However, there is no indication that the inquiries were directed at the subject zone or property.
From observation of the site, and the evidence submitted, the court finds that the site is hilly and contains a significant portion of wetlands which would inhibit its commercial development given the availability of other space. In addition, there was sufficient credible evidence presented by Frank Magnotta, the applicant's engineer, concerning the difficulty of constructing buildings for commercial use on the terrain and topography, buildings which would require large areas for parking and septic purposes.
Given the lack of interest in the site for commercial/industrial use, the Commission cannot meet its burden of proof that substantial public interest in health or safety outweigh the need for affordable housing. Clearly, while the commission may properly and legally consider the use of land for economic development, such consideration in connection with section 8-30g requires that the commission assume the burden of proving that this site is needed more as it is presently zoned than as CT Page 10536 zoned for affordable housing. The commission's emphasis on commercial development reflects a perceived need, that of having commercial property bear a larger share of the property tax burden. However, there is no evidence that commercial development is competing for this particular property, or for that matter, other commercially zoned property in Durham. Therefore, this emphasis conflicts with the present need for affordable housing which the legislature has determined exists.
In Reason 3, the Commission cited its reasons for designating the subject parcel as DD.
As to sub-reason (1) the court notes, from a review of the zoning map, that to the west of the subject property there is an area zoned for Farm Residential use. It lies on Route 68 across from the Heavy Industry district and adjacent to the Tilcon property zoned for industry on the west. The rezoning of the subject property would allow the FR zone on the west to be adjacent to a residential zone. As the zones presently exist, the FR zone is surrounded by non-residential zones. The concern that the subject property would need a buffer is not consistent with the fact that other residential zones abut HID zones. Furthermore, there was no evidence that dust, pollutants or noise presently emanate from the HID zones. In fact, one homeowner's problem with emissions was addressed by Tilcon directly upon the homeowner's contact with the company. Furthermore, section 7.03 of the zoning regulations sets forth performance standards which prohibit emissions of dust, dirt and noxious odors, the transmission of objectionable noises, the discharge of harmful wastes and the conducting of hazardous activities. (No. 6677, ROR Item 55). Any failure to comply with these standards would allow the zoning enforcement official to take appropriate steps to achieve compliance.
Sub-reasons (2), (3) and (4) speak of `potential" or "future" events such as Tilcon's expansion, "further conflicts between potentially expensive residential properties and the Tilcon mining operation", and "future conflicts between future industrial uses and existing residential uses." The evidence includes a copy of the 1992 "25 Year Mine Plan-Tilcon Tommasso, Durham-Wallingford, Ct. Quarry." This plan provides for the grading of the Tilcon site over 25 years so as to provide an expanse for industrial/commercial development. This plan is simply that, a plan. There is no further evidence of Tilcon's plans to expand in the record. Therefore, the record does not reasonably support the commission's reliance on these sub-reasons. CT Page 10537
Sub-reasons (3) and (4) are speculative and generalized. There is no evidence in the record to indicate that potentially expensive residential properties would locate near this area, nor that there would be future industrial use north of Commerce Circle along Route 157.
As to sub-reason (5), there was little evidence provided as to the property boundaries, other than Tilcon's, or the natural features, other than the wetlands, which define the zone. The commission's 1986 record of its decision to change the zone was not made part of this record.
The record lacks evidence to support sub-reason (6) with regard to the extent of the "housing growth" or "employment opportunities" which existed at the time of the decision. It is unclear as to what elements comprise the "balance" the commission sought in 1986 or seeks today.
Reason 4 is perhaps the most significant in terms of the zoning commission's area of authority. The decision to set aside a portion of Durham for economic development is logical. However, in the absence of a present demand for the DD zone, the commission engages in speculation in assuming that the "railroad tracks" will be in use at some unspecified future date when the property becomes more marketable as a commercial piece. In addition, the location of the railroad tracks, although a short distance from the subject property, is not adjacent to it. Between the railroad and the subject property is a residential area. Any use of the railroad would require some form of transportation from the site to the railroad. Further, the record is unclear as to the extent of the present use of the railroad or its facilities. Reason 4 is not reasonably supported by the record.
The court finds that the commission's reasons for denial were not supported by sufficient evidence in the record. No substantial public interest was served by keeping this particular subject parcel designated as a DD zone. There was no evidence that the specific property was sought after as a commercial site that would increase the tax base for the town. There are other sites in neighboring towns which pose fewer problems for development. The commission neither established a level of harm in connection with the zone change nor the probability that the zone change would cause the harm. Similarly, the commission did not establish, on the basis of the record, that the denial of the zone change was necessary. CT Page 10538 Therefore, the public interest was outweighed by the legislature's determination of the need for affordable housing.
The commission's failure to address the affordable housing application on its merits prevents the court from addressing concerns the commission could legitimately have had with the proposed development. In relying on past decisions and generalizing them for future application the commission did not exercise its responsibility to impose standards on the development.
For the foregoing reasons, the decision of the commission is reversed, and the appeal is sustained.
Leheny, J.