[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
On May 27, 1994, the Glastonbury Housing Development, Inc. (GLAHD), filed an application for a zone change with the defendant, Town Council (Council), the zoning authority of the Town of Glastonbury. The legal owner of the property sought to be developed by GLAHD is the Carolyn L. Liebler Trust, Carolyn M. Bogue and Francis L. Liebler, Trustees. The property subject to the proposed zone change application consists of several parcels which total 26.43 acres, although the owners hold title to an additional 17 plus acres to the south of the subject premises which they intend to deed to the Town as open space. Some portions of the affected parcels are zoned as a "Planned Business and Development Zone," some as "Planned Industrial Zone," and some as "Flood Zone." GLAHD desires to change the bulk of the property to "Flood Zone" and the remaining 8.2 acres to "Residence A."
The application states that the reason for the requested change is to allow for development of an affordable housing proposal as a Planned Area Development (PAD) pursuant to § 4.12.3(c) of the Building Zone Regulations of the Town (Building Regulations). (ROR, Item I.I: Application for Zone Change, sub-item 1(a): Cover Letter.) GLAHD informed the Council that it planned to develop the subject property as "affordable housing" in accordance with § 8-30g of the General Statutes.
The Council held three public hearings on the zone change application and, on October 11, 1994, denied the application. The ten reasons the Council gave for its denial are as follows:
1. Use of the subject property for residential purposes CT Page 5433-RR is incompatible with surrounding industrial and commercial land uses and zoning[,] including an oil storage facility, three auto repair shops, and a truck rental operation. Additionally, there are no Residence A lands abutting the subject property.
 2. The close proximity of the oil storage facility poses a potential safety hazard for future residents, with particular concern for residential development on the most westerly portion of the site.
 3. Residential use of this property continues the pattern [sic] and would expand the imbalance of concentrating affordable housing within the Town Center (i.e., northwest quadrant of the Town).
 4. The property as it exists today is predominantly within a flood hazard area. Although there is evidence that the area is capable of being removed from flood hazard, that capability has not been approved or implemented as of this date.
 5. The change of 5.6 acres of Commercial and Industrial zoned land to Residence A would deprive the Town of one of the last undeveloped commercial parcels in that area of the Town Center.
 6. There would be potential liability to the Town, if[,] being aware of flood and fire hazards to persons or property, it should approve this proposed residential development.
 7. The proposal represents a destruction of an encroachment on the Flood Plain and the loss of productive farmland and would establish a dangerous precedent.
 8. There would be a real flood hazard and danger to residents, the building and property.
 9. In the event of a leak, spill[,] ignition and/or fire at the adjoining oil storage facility, future residents would be placed in a high[-]risk situation, jeopardizing their health and safety.
 10. In view of the above factors, there is a real danger to health, safety and welfare of the future children and residents who would reside on this property.
(Return of Record (ROR), Item III.C: Minutes of October 11, 1994 CT Page 5433-SS meeting, pp. 14-15; Motion to Complete Record, dated June 26, 1996, Item 4, pp. 2-3.)
GLAHD filed this appeal alleging that the Council's denial of its application was illegal, arbitrary, an abuse of discretion and in violation of General Statutes § 8-30g.
A. THE STATUTORY SCHEME AND STANDING TO APPEAL
General Statutes § 8-30g, the Affordable Housing Land Use Appeals Act (Act), modifies the procedure of judicial review of certain land use appeals to the Superior Court. The land use appeals affected by § 8-30g are those in which the development proposed includes a certain percentage of "affordable housing" as defined by the Act.
An affordable housing development is defined as a "proposed housing development (A) which is assisted housing or (B) in which not less than twenty percent of the dwelling units will be conveyed by deeds containing covenants or restrictions which shall require that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing, as defined in section 8-39a, for persons and families whose income is less than or equal to eighty percent of the area median income, for at least twenty years after the initial occupation of the proposed development. . . ." General Statutes § 8-30g(a)(1).
An affordable housing application is defined as "any application made to a commission in connection with an affordable housing development by a person who proposes to develop such affordable housing. . . ." General Statutes § 8-30g(a)(2). The Act permits an appeal by "[a]ny person whose affordable housing application is denied or is approved with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable housing dwelling units. . . ." General Statutes § 8-30g(b).
The defendant Council argues that this appeal is not properly within the appeal procedure set forth in § 8-30g because it claims GLAHD is not "a person who proposes to develop affordable housing" within the meaning of 8-30g(b). The Council claims that GLAHD failed to give "meaningful assurance" that the property would be used to build affordable housing. This argument CT Page 5433-TT challenges GLAHD's standing to pursue this appeal.
"The issue of standing implicates the court's subject matter jurisdiction." Appeal from Probate of Bencivenga, 30 Conn. App. 334,337, 620 A.2d 195 (1993), aff'd, 228 Conn. 439, 636, A.2d 832 (1994). Standing focuses on the party seeking to be heard and not on the issues that party wants to have decided. Zoning Boardof Appeals v. Planning Zoning Commission, 27 Conn. App. 297,300, 605 A.2d 885 (1992). The focus is on whether one is a proper party to request adjudication of the issues, rather than on the substantive rights of the aggrieved parties. Nye v. Marcus,198 Conn. 138, 141, 502 A.2d 869 (1985). A party cannot rightfully invoke the jurisdiction of the court unless that party has some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. Investors Mortgage Co. v. Rodia, 31 Conn. App. 476,479, 625 A.2d 833 (1993). There must be a colorable claim that the party has suffered or is likely to suffer more direct injury in an individual or representative capacity. Maloney v. Pac,183 Conn. 313, 321, 439 A.2d 349 (1981); Mobil Oil Corp. v. ZoningBoard of Appeals, 35 Conn. App. 204, 644 A.2d 401 (1994).
The court finds that this assertion is unsupported by the record. The record indicates that GLAHD has sought various agency approvals for this proposed development since 1991. For example, it has entered into contracts with providers of parking for an emergency evacuation plan which would be required in order for development to be approved. (ROR, Item I.I: Application for Zone Change, sub-item 9: Contract.) Its cover letter accompanying its application states that it has proposed the development of 159 units of affordable housing, one-half of which are to be affordable housing pursuant to § 8-30g. (ROR, Item I.I: Application for Zone Change, sub-item 1(a): Cover Letter.) This statement by GLAHD is consistent with the Supreme Court's decision in Kaufman v. Zoning Commission, 232 Conn. 122, 143,653 A.2d 798 (1995), which held that a similar statement of intent by an applicant was sufficient to conclude that the application had been made "in connection with an affordable housing development," as § 8-30g(a)(2) requires.
Further, although GLAHD did not include a copy of a deed with restrictive covenants with its application, it stated at the public hearing that such a document would be provided at the next stage of administrative review at the time of the filing of the Planned Area Development (PAD) application. (ROR, Item IV.B: CT Page 5433-UU Transcript of October 4, 1994 hearing, p. 50.)
The Council's doubt as to whether the property would be developed for affordable housing apparently arose because of the presentation at the public hearing of a former member of GLAHD's board, Howard O'Connell. O'Connell questioned the feasibility of the financial arrangements to be made in connection with the proposed development, claiming that GLAHD "has no money and no budget." (ROR, Item IV.B: Transcript of October 4, 1994 hearing, p. 6; ROR, Item IV.C: Transcript of October 11, 1994 hearing, p. 4.) Notably, the Commission did not deny the application on either GLAHD's alleged lack of standing or its financial arrangements.
The court finds that there is sufficient indicia in the record that GLAHD intends to build affordable housing and further intends to address the issue of deed restrictions and financing at the PAD application stage. In Kaufman, the court stated: "In the face of unchallenged representations with regard to the [applicant's] intention [to build affordable housing], the statute does not requires specific additional evidence that the dwelling units `will be conveyed by deeds containing covenants or restrictions. . . .' Indeed, we previously have affirmed a trial court's determination that an applicant's `proposed housing units would be deed restricted within the definition of § 8-30g(a)(1)(B)' on the basis of evidence that the `plaintiff indicated its intent to use a . . . declaration, containing restrictions and covenants that run with the land' similar to a declaration that had been used by other developers in the past." (Emphasis in original; alterations in original; citation omitted.) Kaufman v. Zoning Commission,
supra, 232 Conn. 145-46.
Moreover, the court in Kaufman explicitly held that the commission could grant the requested zone change on the condition that the new zone be used only for affordable housing. Id., 147-48. Similarly, the Council in this case could require the developer, owner or manager of the affordable housing development to continue to comply with the covenants and deed restrictions, or could devise a mechanism whereby noncompliance by the applicant could be discovered and corrected.
The court finds, therefore, that the standing issue raised by the council in its brief is without merit, and GLAHD is not precluded from utilizing § 8-30g as a vehicle for administrative appeal review.
B. STANDARD OF REVIEW CT Page 5433-VV
In the traditional appeal of a decision made by a zoning authority acting on a proposed zone change, the trial court must uphold the legislative decision if the decision is reasonably supported by the record. Kaufman, supra, 232 Conn. 150-51; WestHartford Interfaith Coalition, Inc. v. Town Council, 228 Conn. 498,513, 636 A.2d 1342 (1994). Since this appeal falls within the purview of § 8-30g, the burden of proof, which in traditional zoning practice lies with the applicant, lies with the commission — in this case, the Town Council.
General Statutes § 8-30g(c) provides that in an affordable housing appeal, "the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission, that[:] (1) the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record; (2) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (3) such public interests clearly outweigh the need for affordable housing; and (4) such public interests cannot be protected by reasonable changes to the affordable housing development. If the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it." General Statutes § 8-30g(c).
As noted in subsection (c)(1), the reasons for the commission's decision must be supported by "sufficient evidence." The Supreme Court in Kaufman confirmed that the "sufficient evidence" standard was the standard to be used in affordable housing appeals, rather than the higher standard of "sufficient evidence" used in other appeals from administrative agencies, noting the comments of Representative Richard Tulsano at the legislative hearings: "the term `sufficient evidence' in § 8-30g means `[e]nough evidence for one to reach a particular conclusion. . . . It is not a very high standard whatsoever . . . something has to be there and [the commission] will have sustained [its] burden." (First two alterations in original.)Kaufman v. Zoning Commission, supra, 232 Conn. 152, quoting from 32 H.R. Proc., Pt. 30, 1989 Sess., p. 10579.
C. THE COUNCIL'S REASONS FOR DENIAL OF THE APPLICATION
1. Safety: Oil Storage Tanks
CT Page 5433-WW
The Council expressed concern over the issue of public safety; this is evident in reasons two and nine with regard to the proximity of the proposed development to the underground oil storage tank nearby. The Council's second reason states that: "The close proximity of the oil storage facility poses a potential safety hazard for future residents, with particular concern for residential development on the most westerly portion of the site." (ROR, Item III.C: Minutes of October 11, 1994 meeting, pp. 14-15; Motion to Complete Record, dated June 26, 1996, Item 4, pp. 2-3.) The ninth reason states that: "In the event of a leak, spill[,] ignition and/or fire at the adjoining oil storage facility, future residents would be placed in a high[-]risk situation, jeopardizing their health and safety." (ROR, Item III.C: Minutes of October 11, 1994 meeting, pp. 14-15; Motion to Complete Record, dated June 26, 1996, Item 4. pp. 2-3.)
The Council's concern over the proximity of the planned units to an oil storage tank is justifiable. However, as discussed below, it is not a concern which is unique to this proposed use of the premises as compared to other permitted uses under the current zoning regulations.
In a letter dated August 22, 1994, Christopher N. Siwy, Fire Marshall of the Town of Glastonbury, responded to questions posed by Attorney Twachtman, counsel for GLAHD, in a letter dated August 18, 1994. Twachtman had written to Siwy after being questioned by members of the Town Planning and Zoning Commission, the body that makes recommendations on any proposed change in the building zone map. (ROR, Item I.E: Letter from Siwy to Twachtman, dated August 22, 1994.) Siwy noted that his office had worked in conjunction with the design engineers of the subject proposal to determine the minimum distance of building setback requirements in relation to Tank # 14, which lies at the corner of Welles and Phelps Streets, just off the northwest corner of the subject premises. (ROR, Item I.E, p. 1.)
Siwy stated that the distance setback requirements were based upon the National Fire Protection Association Flammable and Combustible Liquids Code, and that the criteria used resulted from "over one hundred years of fire experience, experimentation, research and recognized engineering standards since this code was established." (ROR, Item I.E, p. 1.) He also noted that his office had increased the distance required for GLAHD's proposal "to provide an additional margin of safety above the recommended distance set forth in the recognized engineering design CT Page 5433-XX practices." (ROR, Item I.E, p. 1.) Siwy stated that "the intention of [the] code and its applicable provisions [is] to reduce the associated hazards to a degree which is consistent with reasonable public safety." (ROR, Item I.E, p. 2.) Siwy also stated that "the code attempts to recognize modern day society. In this regard, by the nature of flammable and combustible liquids, compliance with codes and standards does not totally eliminate all hazards in use of the same. Accidents, whether caused by providence, mechanical failure, human error or intentional acts, are always possible." (ROR, Item I.E, p. 2.)
Although, as noted above, concerns for safety with the nearby oil storage tank are justifiable, the court fails to see how the threat posed to the 300 proposed residents is any greater than the threat posed to other potential users of the site, according to the current zoning regulations. For instance, § 4.8.1 of the Town's Building Zone Regulations permits the following population-intensive uses of property located in the "Planned Industrial Zone," in which a portion of the subject property lies — an auditorium or coliseum, day care facilities, various manufacturing uses, a vocational or trade school, offices, a skating rink, and tennis courts. (ROR, Motion to Complete Record, dated June 26, 1996, Item 5: Town of Glastonbury Building Zone Regulations, § 4.8.1, pp. 37-38.) Additionally, § 4.6.1 of the Town's Zoning Regulations permits the following population-intensive uses of property located in the Planned Business and Development Zone, in which another portion of the subject property lies — athletic clubs, an auditorium or coliseum, a bus passenger terminal, a community center, a convalescent nursing or rest home or sanitarium, a day care center, place of worship, museum or planetarium, various retail uses, a skating rink and tennis courts. (ROR, Motion to Complete Record, dated June 26, 1996, Item 5: Town of Glastonbury Building Zone Regulations, § 4.6.1, pp. 29-30.)
Given the range of population-intensive uses permitted in the current zoning regulations, the court is unable to understand how the safety concerns relied upon by the Council as a reason for its denial of GLAHD's application would not be applicable to any
of the permitted uses of the land. It would seem, for instance, that the safety reasons which the Council claims pertain to the residents of the proposed units would also pertain to the occupiers of schools, nursing homes, auditoriums as well as the other uses accommodating large concentrations of persons, all of which are permitted under the scope of the current zoning CT Page 5433-YY regulations.
In sum, with respect to the safety issues regarding the oil storage tanks, the court finds that the Council did not meet its burden of proving, by sufficient evidence, that its decision to deny GLAHD's application was "necessary to protect substantial public interests in health, safety or other matters" and that "such public interests clearly outweigh the need for affordable housing" nor that the "public interests cannot be protected by reasonable changes to the affordable housing development." General Statutes § 8-30g(c).
2. Safety: Flood Hazards
Reasons four and eight given by the Council in its denial of GLAHD's application address the potential of floods and the hazards thereby posed to the potential residents. The Council's fourth reason states: "The property as it exists today is predominantly within a flood hazard area. Although there is evidence that the area is capable of being removed from flood hazard, that capability has not been approved or implemented as of this date." (ROR, Item III.C: Minutes of October 11, 1994 meeting, pp. 14-15; Motion to Complete Record, dated June 26, 1996, Item 4. pp. 2-3.) The Council's eighth reason states that: "There would be a real flood hazard and danger to residents, the building and property. (ROR, Item III.C: Minutes of October 11, 1994 meeting, pp. 14-15; Motion to Complete Record, dated June 26, 1996, Item 4, pp. 2-3.)
The northwesterly portion of the subject property, consisting of 26.43 acres on the southerly side of Welles Street, is the proposed location of the three housing units. The flood line zone snakes in and out of this parcel, running in an east-west direction, then in a north-south direction until it turns easterly towards Rankin Road, a so-called "paper" road, which forms the easterly boundary of this parcel. A stream channel encroachment line was established by the Commissioner of the Department of Environmental Protection (DEP) pursuant to General Statutes § 22a-342. No encroachment may be placed beyond this line in a flood-prone area without the Commissioner's authorization. Since GLAHD proposes to place parking for 366 cars within the stream channel encroachment line, it sought and obtained approval for such an encroachment.
The DEP officer that reviewed GLAHD's proposal recommended that the permit issue after considering GLAHD's Emergency CT Page 5433-ZZ Response Plan, submitted at the DEP's request. The Plan provided for: (1) notification to the residents of the proposed housing units of the potential hazards of traveling between the alternative host parking lots and the residential complex during floods; (2) a towing contract in the event that the car owners did not remove their cars when flood warnings were given; (3) contracts for the provision of host parking facilities in the event of evacuation of the parking lots; and (4) a guarantee from a permanent entity, in this case, the Glastonbury Housing Authority, to assume full responsibility to implement the plan in the event GLAHD does not do so. (ROR, I.I, Items 5-11.)
The Council's concern for the safety of the potential residents arose from its awareness of floods which had occurred in the past near or at the subject site. However, GLAHD had proposed to raise the elevation of the land so that the lowest floor elevation of the buildings would be at 32 feet, which is slightly in excess of the 500 year flood elevation of 31.8 feet. (ROR, Item I, sub-item 6, p. 2.) Moreover, in moving topsoil from one area of the subject property to the area where the buildings would be located, GLAHD would be adding over 14,000 cubic feet of flood storage capacity. (ROR, Item IV.A: Minutes of September 27, 1994 hearing, p. 8.)
The public and the Council members discussed earlier floods at the public hearings, notably the 1936 flood, which exceeded the 500 year line, and the 1938 and 1984 floods, which did not. Their concern is certainly justified. However, as with the safety concerns discussed above, the court does not find that there is any special danger presented by potential floods to the proposed housing that would not also be presented to any of the other permitted uses under the zoning regulations.
Although members of the public and the Council members expressed practical concerns over the working of such an evacuation plan, the court finds that the Council did not meet its burden of providing sufficient evidence for its reasons for its denial in accordance with General Statutes § 8-30g(c). The Council concluded, from its own experience, that such an evacuation would be difficult, which it is permitted to do;Feinson v. Conservation Commission, 180 Conn. 421, 427,429 A.2d 910 (1980); however, its finding was contrary to the DEP's finding, supported by evidence in the record, that there would be ample warning as to when the Connecticut River would reach flood stage at Glastonbury. (ROR, Item I.I: Application for Zone CT Page 5433-AAA Change, sub-item 4, p. 5, ¶ 11.)
Furthermore, the court finds that the Council could have made changes in the application that would have adequately protected the public interest in accordance with General Statutes § 8-30g(4), such as by requiring that the evacuation plan be implemented within hours of notice of an impending flood. In short, although the Council's concerns about flooding may have been well founded, the Council did not sufficiently overcome the DEP's findings and conclusions in its issuance of a permit to encroach a flood-prone area, that GLAHD's Emergency Response Plan provided adequate protection for the residents. Accordingly, the court finds that the Council has not met its burden of proving, by sufficient evidence, that its decision to deny GLAHD's application with respect to the flooding issues was "necessary to protect substantial public interests in health, safety or other matters" and that "such public interests clearly outweigh the need for affordable housing" nor that the "public interests cannot be protected by reasonable changes to the affordable housing development." General Statutes § 8-30g(c).
3. Potential Liability of the Town
The sixth reason announced by the Council for its denial of GLAHD's application was that: "There would be potential liability to the Town, if[,] being aware of flood and fire hazards to persons or property, it should approve this proposed residential development." (ROR, Item III.C: Minutes of October 11, 1994 meeting, pp. 14-15; Motion to Complete Record, dated June 26, 1996, Item 4. pp. 2-3.) The record reflects public concern that liability might accrue to the Town of Glastonbury if GLAHD's proposal were approved. The court finds that the Council had no evidence to support such a conclusion. In fact, one "Mr. Johnson," who was identified only as an "administrator," spoke at the public hearing and indicated that the Town had no responsibility to his knowledge and that the Housing Authority, which is responsible for carrying out the emergency plan in the event the developer does not; see Part C.2, above; was a separate entity and is "not administratively tied to the Town proper."[1] (ROR, Item IV.C: Transcript of October 11, 1994 hearing, pp. 5-6.) In addition, General Statutes § 52-557n
provides as follows: "Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by: . . . (B) negligent acts or omissions which require the exercise of judgment or discretion CT Page 5433-BBB as an official function of the authority expressly or impliedly granted by law." In accordance with the above, the court finds that the Council's concern about potential liability accruing to the Town is without a basis in fact and is, accordingly, rejected by the court. The court thus finds that the Council has not met its burden of proving, by sufficient evidence, that its decision to deny GLAHD's application with respect to the issue of Town liability was "necessary to protect substantial public interests in health, safety or other matters" and that "such public interests clearly outweigh the need for affordable housing" nor that the "public interests cannot be protected by reasonable changes to the affordable housing development." General Statutes § 8-30g(c).
4. Incompatibility With Other Uses
The first reason stated by the Council is rejecting GLAHD's application was that: "Use of the subject property for residential purposes is incompatible with surrounding industrial and commercial land uses and zoning[,] including an oil storage facility, three auto repair shops, and a truck rental operation. Additionally, there are no Residence A lands abutting the subject property." (ROR, Item III.C: Minutes of October 11, 1994 meeting, pp. 14-15; Motion to Complete Record, dated June 26, 1996, Item 4. pp. 2-3.) While none of the subject land is currently zoned residentially, there is a 76 unit residential apartment complex for the elderly located just to the north of the proposed development, across Welles Street. (ROR, Item II.C: Map.) In September, 1994, the Town Planning and Zoning Commission approved the designation of the property from "Flood Plain 100 Year and Meadows" to "Urban-Town Center" in the Town's Plan of Development. (ROR, Item I.C: Letter from Kenith Leshe, Community Development Director to Attorney Twachtman, dated September 8, 1994.) This latter category encompasses commercial and retail establishments as well as residential areas providing "a variety of housing alternatives." (ROR, Motion to Complete Record, Item 1: Plan of Development of Town of Glastonbury, dated May 22, 1984, p. 13.) Therefore, while there is no "Residence A" zone abutting the subject property, the residential use itself is not incompatible with the general surrounding area. Moreover, the proposed development does not require significant modifications in the infrastructure since the area is currently being served by public utilities such as water and sewer. In sum, the court finds that the Council did not meet its burden of proving, by sufficient evidence, that its decision to deny GLAHD's CT Page 5433-CCC application with respect to the "incompatibility" issue was "necessary to protect substantial public interests in health, safety or other matters" and that "such public interests clearly outweigh the need for affordable housing" nor that the "public interests cannot be protected by reasonable changes to the affordable housing development." General Statutes § 8-30g(c).
5. Concentration of Affordable Housing
The third reason stated by the Council for its denial of GLAHD's application was that: "Residential use of this property continues the pattern [sic] and would expand the imbalance of concentrating affordable housing within the Town Center (i.e., northwest quadrant of the Town)." (ROR, Item III.C: Minutes of October 11, 1994 meeting, pp. 14-15; Motion to Complete Record, dated June 26, 1996, Item 4. pp. 2-3.)
The larger area in which the subject parcel is located contains mixed residential uses, which the court noted on its visit to the site and the surrounding area. Aside from the elderly apartment complex north of Welles Street across from the site, there is no evidence in the record to show what proportion of the total housing in the northwest quadrant of the town qualifies as "affordable housing." Thus, the court has no evidence suggesting a "concentration of affordable housing within the Town Center" as suggested by the Council.
In any event, even if that were the case, Glastonbury is not exempt from the affordable housing provisions of the General Statutes because Glastonbury has not yet met the legislature's mandate requiring a municipality to provide 10 percent of its housing stock as "affordable housing" as defined by § 8-30g. (ROR, Item I.I, Application for Zone Change, sub-item 27: Notice from Sandy Bergin, Supervisor, Research Unit for Department of Housing, dated March 13, 1992. p. 3.)
The "Urban Town Center" designation of the subject property in the Town's Plan of Development calls for the support and encouragement of multi-family housing. (ROR, Motion to Complete Record, Item 1: Plan of Development, p. 14.) Accordingly, the court finds that the Council has not met its burden of proving, by sufficient evidence, that its decision to deny GLAHD's application with respect to the "concentration of housing" issue was "necessary to protect substantial public interests in health, safety or other matters" and that "such public interests clearly CT Page 5433-DDD outweigh the need for affordable housing" nor that the "public interests cannot be protected by reasonable changes to the affordable housing development." General Statutes § 8-30g(c).
6. Deprivation of Undeveloped Commercial Parcels
The Council's fifth reason for denying GLAHD's application was that: "The change of 5.6 acres of commercial and industrial zoned land to Residence A would deprive the Town of one of the last undeveloped parcels in that area of the Town Center." (ROR, Item III.C: Minutes of October 11, 1994 meeting, pp. 14-15; Motion to Complete Record, dated June 26, 1996, Item 4. pp. 2-3.)
Kenith E. Leslie, the Community Development Director for the Town of Glastonbury, provided the Council with a memorandum on October 6, 1994, in which he stated that significant development potential existed in certain sites which consist of approximately 93 acres. (ROR, Item II.A: Memorandum from Kenith Leslie to Richard A. Johnson, dated October 6, 1994.) He further indicated that it was not anticipated that the Town Center area would expand geographically unless the "Rankin Road connector" were implemented. (ROR, Item II.A, p. 1.) Since Rankin Road is only a "paper" road at present and there was no discussion of plans in the foreseeable future to improve it, this statement is speculative, at best.
At the public hearing on October 4, 1994, Leslie was asked about the importance of the subject parcel as industrial and commercial property. He indicated that its desirability as industrial land was a function of its proximity to river traffic "when there was commerce on the river." (ROR, Item IV.B: Transcript of October 4, 1994 public hearing, p. 39.) Recently, however, the focus of "prime commercial industrial" land is at the interchange of Route 2 and Hebron Avenue. (ROR, Item IV.B, p. 39.) In addition, Leslie stated that one of the reasons the area had been designated as the Town Center in the Plan of Development was because the "small amount of acreage" was a "limiting factor as to development" of the area. (ROR, Item IV.B, p. 39.)
Moreover, one member of the Town Council, who is also a Hartford firefighter, offered cogent reasons based on his training for his objection to the proposed units being located near the oil storage tank. While he may certainly utilize his experience in arriving at such a decision; Feinson v.Conservation Commission, supra; his argument is directly CT Page 5433-EEE contradicted by his additional statement that the "land may someday be . . . a viable opportunity for the Town to expand its commercial industrial development. . . ." (ROR, Item IV.C: Transcript of October 11, 1994 hearing, p. 31.) The same safety concerns cited as reasons to deny GLAHD's application for affordable housing would be equally applicable to any commercial industrial development entered into on the same premises.
The court finds that the Council's desire to retain "one of the last undeveloped parcels in that area of the Town Center" is not borne out by the facts in the record. Accordingly, the court finds that the Council has not sustained its burden of proving, by sufficient evidence, that its decision to deny GLAHD's application with respect to the "deprivation of commercial parcels" issue was "necessary to protect substantial public interests in health, safety or other matters" and that "such public interests clearly outweigh the need for affordable housing" nor that the "public interests cannot be protected by reasonable changes to the affordable housing development." General Statutes § 8-30g(c).
7. Loss of Productive Farm Land
The seventh reason stated by the Council in denying GLAHD's application was that: "The proposal represents a destruction of an encroachment on the Flood Plain and the loss of productive farm land and would establish a dangerous precedent." (ROR, Item III.C: Minutes of October 11, 1994 meeting, pp. 14-15; Motion to Complete Record, dated June 26, 1996, Item 4, pp. 2-3.) The record is devoid of evidence presented by the Council of the productivity of the farm land to be lost, or of the necessity of the flood plain to that agricultural use. Additionally, it is unclear to the court what the Council envisioned as the "dangerous precedent" to be set. In fact, the Council's finding is in direct contravention to the finding of the Conservation Commission that "prime agricultural soil resources [would] be protected" by the proposed development. (ROR, Item I.I: Application for Zone Change, sub-item 14, p. F-2.) The Conservation Commission indicated that it would be prepared to submit a plan for the use of the open space area to "retain active agriculture on designated areas, all lying within the Channel Encroachment Lines, with the land to be leased to farmers under specified agreements." (ROR, Item I.I, sub-item 14, p. 9.)
In addition, GLAHD's attorney, Walter Twachtman, who is also a member of GLAHD's board of directors, stated that 15 acres of CT Page 5433-FFF the 26 1/2 acre parcel is to be deeded to the Town for open space. (ROR, Item IV.B: Transcript of October 4, 1994 hearing, p. 1.) This acreage would be added to the 17 plus acre parcel south of the subject property, also owned by the Liebler Trust, which would be deeded to the Town for open space. One Council member, in voting to deny GLAHD's application, acknowledged that there are "many things that the owner of the property can do with the property and they're not simply limited to farming." (ROR, Item IV.C: Transcript of October 11, 1994 meeting, p. 28.) However, if the 15 acre parcel is to be deeded to the Town for open space, it would not be in the hands of a private individual to use for other non-agricultural purposes, as the Council member above suggested.
In sum, the court finds that the Council has not met its burden of proving, by sufficient evidence, that its decision to deny GLAHD's application with respect to the "loss of productive farmland" issue was "necessary to protect substantial public interests in health, safety or other matters" and that "such public interests clearly outweigh the need for affordable housing" nor that the "public interests cannot be protected by reasonable changes to the affordable housing development." General Statutes § 8-30g(c).
D. GLAHD'S REQUEST TO TREAT THE APPEAL AS A PAD APPLICATION
GLAHD has requested that the court treat the record in this appeal as a PAD application so as to obviate the necessity of seeking further review with the Town Council of the Town of Glastonbury. (Plaintiff's Brief, pp. 52-53.) Given the treatment of the instant application, GLAHD's reluctance to file another application is understandable. The court takes judicial notice of the hostile emotional undertones in the defendant's brief and in the record and notes that those undertones are so significant that the court believes arguments can be advanced regarding the Council's predetermination of future affordable housing applications. First, that is not the issue before the court; second, even if the court were to treat this appeal as a PAD application, the information that is before the court does not appear to fully conform to the requirements of the submission of a PAD application.
For the foregoing reasons, the court sustains the plaintiff's appeal and remands this case to the Council to direct that the requested zone change be granted to this applicant conditioned upon its building of affordable housing. CT Page 5433-GGG
Leheny, J.