[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an appeal by the plaintiff Sam's Real Estate Business Trust ("Sam's") from the action of the defendant Planning Zoning Commission of the Town of Manchester ("Commission") denying Sam's application to build and maintain gasoline service facilities at its preexisting retail premises. Because the area in issue is within a "Comprehensive Urban Development" zone, the regulatory structure does not entirely comport with more traditional black letter concepts; see, e.g., Tondro, Connecticut Land Use Regulation, 2d Ed. (1992) 70-72, 636 et. seq.; and the analysis does not lend itself to deriving results from strict or easily defined categorization.
The instant controversy arises from an application filed by Sam's with the commission on August 22, 2001. The application sought to add six gasoline islands, incorporating twelve pumping facilities, to Sam's retail facilities on 69 Pavilions Drive in Manchester. According to the plan, approximately an acre of its parking lot would be devoted to the new use. After the commission's staff had reviewed the application and circulated it to various officials for comment and tentative approval, a public hearing was held on October 15, 2001. A spokesperson for Sam's, Jay Giles, was the only member of the public present at the hearing. At a business meeting following the public hearing, but on the same day as the hearing, the commission denied the application, on the stated ground that the change would create more traffic than indicated and would create a safety hazard. Sam's has appealed to this court.
The parties fundamentally disagree on just what sort of action the commission took when it denied the application. Sam's insists that the commission was acting in an administrative capacity and that several consequences therefore follow, including, among others, the requirements that an application be approved if it meets the specific criteria for the issuance of a special permit or special exception and that reasons for the denial be stated on the record and be supported by substantial CT Page 15998 evidence. The commission argues that the action was legislative, in that it was in effect considering amending an allowed use in a zoning district. Because of the fundamental disagreement,[1] some discussion of the Manchester zoning regulations may be helpful.
Sam's premises have been located at all relevant times in Manchester's comprehensive urban development ("CUD") zoning district.[2] The regulations governing the CUD zone appear in Article II, Section 8 of the Regulations. The CUD zone has some of the characteristics of the so-called "floating zone" described in Sheridan v. Planning Board ofStamford, 159 Conn. 1 (1969) and in Tondro, supra. Its purpose is to allow "planned development of various types of commercial, industrial and residential land uses as well as certain accessory uses and special exception uses"; Art. II, § 8.01.01; and the expressed intent is "to permit greater flexibility and, consequently, more creative and imaginative design for development than generally is possible under conventional zoning. It is further intended to promote more economical and efficient use of the land while allowing a harmonious variety of land uses, a higher level of urban amenities, and preservation of natural scenic qualities of open spaces." Art. II, § 8.01.02. Any owner of land in the CUD zone who wishes to develop a site is to submit a "Preliminary Development Plan" ("PDP") to the commission, and the "area, location and intensity of land uses" shall be determined by the PDP for each site. Art. II, § 8.01.05. A "Final Development Plan" ("FDP") must be submitted and approved prior to actual development of the site.
The PDP is to reflect the "proposed conceptual development" of the site; the purpose is to show, inter alia, the land use mix, the land use areas, and the intensity of the use. Art. II, § 8.10.03. The various land uses, with attendant requirements, are listed in Table II 8-1 of the Regulations. Retail is Land Use Type I; gasoline service stations fall within Land Use Type X. Among many other items required to be filed with a PDP are a report "regarding existing traffic conditions and information on traffic generated by development of the proposed land, and traffic impact of the traffic generated prepared by a registered professional engineer"; Art. II § 8.10.03(e); and a table of ratios indicating the area of proposed land uses and the like. Art. II § 8.10.03(g).
The considerations for approval of the PDP are as follows. In order to approve, the commission "shall find that the proposed land uses are compatible with the location and natural features of the site, that the proposed location of the land use areas on the site avoids adjacent placement of incompatible uses, that the transition between the different proposed uses is suitable and that adequate buffering as required in Section 8.06.10(b) is provided. The Commission shall also find that the CT Page 15999 proposed land uses meet the purpose and intent of the regulation as set forth in Sections 8.01.01 and 8.01.02 and 8.06.14." Art. II § 8.10.03. Section 8.06.14, in turn, is entitled "Design Review Criteria" and mentions three specific criteria:
 1. The various land uses and proposed building locations shall achieve a convenient proximity to encourage pedestrian travel and a compatible relationship of uses both inside the applicant's project site and to other existing or approved adjacent buildings.
 2. The site plan shall demonstrate that safe and convenient vehicular access shall be provided to the site from arterial or collector roads, and that a pedestrian system shall provide safe and convenient access inside the site between buildings and uses and to and from the site and abutting pedestrian systems.
 3. Internal circulation system shall be designed to accommodate the movement of public transit vehicles and provide areas for transit stops inside the site or accessible to the site from public streets.
If the PDP is approved, the applicant must submit an FDP.[3] The FDP "shall be acted on in the manner prescribed for a site plan approval", and does not require a public hearing, as does a PDP. Specific plans and drawings are to be submitted with the FDP.
Most significantly for the purpose of this dispute, the regulations specifically state that no changes in any development plan regarding land use types, as outlined in the Table, may be made without the submission of another PDP for the site, and such amended or supplemental PDP "shall be regarded as a new submission with respect to the site and shall be subject to all requirements of Section 8.10.03." Art. II, § 8.06.03.
The regulations list some twenty-three categories of uses that are permitted in a CUD zone; retail sales constitutes the first category. Art. II, § 8.03. There are also uses which may be allowed by special exception[4] if four conditions are satisfied; these conditions include the necessity for a finding that the use will not create or aggravate a traffic hazard. Art. II, § 8.04. The uses allowed by special exception, if the qualifying conditions are met, are further subdivided into two categories: those considered by the Zoning Board of Appeals CT Page 16000 ("ZBA") and those considered by the commission. Gasoline stations are to be considered by the ZBA, in accordance with Art. IV, § 5. Thus, a gasoline station may be approved — if the land use is first approved in the PDP process by the commission — by special exception process by the ZBA, which must find, in order to approve, that the four conditions in Art. II, § 8.04 have been satisfied as well as the standard requirements for gasoline stations contained elsewhere in the regulations.
At the risk of oversimplifying, it seems as clear as can be that the CUD zone has some of the aspects of the floating zone. See Sheridan,
supra; Lurie v. Planning Zoning Commission, 160 Conn. 295 (1971). More significantly, the problems in sorting out the various functions regarding approval of sites in the CUD zone are solved by analogy to traditional zoning processes and concepts. Approval of the PDP has all the functional characteristics of the approval of a zoning district; and amending a PDP pursuant to Art. II § 8.06.03 functionally is amending an allowed use in a zone. Both of these functions are traditionally legislative. See Town of Westport v. City of Norwalk, 167 Conn. 151
(1974); Primerica v. Planning Zoning Commission, 211 Conn. 85
(1989); Kaufman v. Zoning Commission, 232 Conn. 122 (1995). of course a facile categorization does not necessarily end the inquiry: a more apt inquiry is whether the action involves the creation of policy or the application of established policy. See Whisper Wind Development Corp. v.Planning Zoning Commission, 32 Conn. App. 515, 524 (1993); affd.229 Conn. 176 (1994). Approval of the FDP, on the other hand, would appear to be the application of policy, such as dealing with site plans and special exceptions or special permits, which are traditionally considered administrative actions. See, e.g., Sheridan, supra; Town ofWestport, supra; Wasicki v. Zoning Board, 163 Conn. 166 (1972).
The process of approving the use of land for gasoline service stations in the CUD zone may be summarized as follows. First, the commission must determine, either in the first instance or by an amended application, that the land use X is appropriate. This initial determination is largely a policy consideration which is to be determined and subsequently judicially reviewed by the application of legislative standards. If the land use is deemed appropriate, then the process is referred to the ZBA for consideration of the special exception: this consideration and subsequent judicial review are governed by the application of administrative standards. If the special exception is approved, the application finally is subject to the FDP process, which is largely ministerial.[5]
Within this conceptual framework, the record reveals the following CT Page 16001 information regarding the processing of the application in question. First, although the record does not include specific documentation regarding the preexisting situation of Sam's premises, it may well be assumed that at some time in the not very distant past both a PDP and FDP for the premises were granted by the commission and that the land use type, according to the Table, was Type I, retail. Because retail is a use which does not require a special exception by either the ZBA or the commission, presumably approval was complete with the approval of both the PDP and the FDP. It is no doubt true that the PDP did not authorize gasoline stations as a land use type, and that, in "floating zone" terminology, the zone "landed" without the ability to build and maintain a gasoline service facility within it.
The application in question, then, was treated as a new application for a PDP, pursuant to Art. II, § 8.06.03. Mr. Giles, Sam's advocate at the public hearing, quite correctly characterized the nature of the application when he stated, "Land use X is gasoline service station use and is a, as I understand the regulations, permissible use in CUD zone following special exception approval by the Zoning Board of Appeals, and however, first prior to that this commission would have to actually permit the land use type X to be utilized on this site." Transcript of 10-15-01 hearing, p. 2. He further stated that no traffic problems were anticipated and that Sam's traffic expert had submitted the required report. He added that the town had agreed with Sam's assessment of the traffic situation. He described the proposal in some detail and noted that there were no other gasoline stations in the CUD zones but there were stations nearby. Transcript, p. 9. Commissioners expressed concerns about adding to existing traffic problems in the area and wondered whether the addition of twelve pumps might contemplate a considerable usage. Lynne Pike DiSanto, a town planner, confirmed that this would be the first gasoline station in the CUD zone, and also confirmed the procedure: the proposal would go from the PDP stage to the ZBA for consideration of the special permit or special exception. If all approved, the plan would return to the commission for consideration of the FDP. Transcript, pp. 17-18.
At the business portion of the meeting, the commissioners expressed a number of concerns. Paramount was the worry that if one gasoline station were permitted in the CUD zone which already experienced traffic problems, they would have to allow subsequent requests for gasoline stations in the zone, in order to act with some uniformity. The commissioners clearly were aware that they were being asked to change the land use plan. See, e.g., pp. 5-8 of the transcript of the October 15, 2001, business meeting. They were worried about the topography of the area and whether there was harmonious land use. They expressed the CT Page 16002 thought that gasoline stations perhaps were more appropriately located on the major roads around the CUD rather than in the CUD zone, and they again were especially concerned that they had to treat all applications uniformly. The staffer suggested that the project, then, be denied, and the staffer suggested the language specifically used in the reason for denial: that there would be more traffic than indicated and that there would be a safety hazard.
Sam's duly appealed. Aggrievement is agreed to: Sam's is the unsuccessful applicant. The appeal is timely. Sam's claims in its complaint that the commission's denial was illegal, arbitrary and an abuse of discretion for four reasons: that the decision is not supported by substantial evidence; that the commission failed to approve the application when the application complied with the applicable regulations; that improper factors were used to deny the application; and that the applicable regulations "fail to contain adequate standards, are vague and unascertainable, and give unlimited discretion to the Commission."
In its briefs, Sam's fleshes out its argument. In sum, it argues that the regulations do not allow the commission to consider traffic, and an application cannot be denied for reasons outside the regulations. See, e.g., Allied Plywood v. Planning Zoning Commission, 2 Conn. App. 506
(1984); Kosinski v. Lawlor, 177 Conn. 420 (1979). Second, it claims that there is no substantial evidence in the record to support the reasons given for the denial, and that when a reason is given for a decision, the court is not at liberty to examine the record to find evidence in support of some other plausible reason. See, e.g., Quality Sand Gravel v.Planning Zoning Commission, 55 Conn. App. 533 (1999). Third, it claims that the regulatory structure is unlawful, at least as applied in this case, because, inter alia, it is not lawful to require two agencies to pass on special exceptions and uniformity is required. See Irwin v.Planning Zoning Commission, 244 Conn.
Most of Sam's concerns are allayed by a proper analysis of the regulatory structure. It is not, as can be seen by the summary provided earlier in this decision, simple, yet it is quite intelligible on careful examination. The fundamental notion is that, in denying the PDP in question, the commission was acting in a legislative or policy-making capacity. As such, the standard for review is not so much whether substantial evidence supports the reason given as it is whether the decision was entirely arbitrary and capricious. The court is not entitled to substitute its judgment for that of the commission. Hawkes v. Planning Zoning Commission, 156 Conn. 207, 209 (1968); see Tondro, supra, 422. CT Page 16003
With this consideration in mind, we consider Sam's specific arguments. The first reason for reversal advanced in the complaint is that the record does not support the commission's decision. With the legislative standard in mind, I cannot hold that the decision is entirely arbitrary and capricious. There was considerable discussion regarding the facts that gasoline stations were located on nearby major roadways and that the premises were apparently not on such a major roadway; that a gasoline station was an inappropriate use on a steeply inclined road with considerable traffic[6] and, most persuasively, that the commissioners were trying to establish the appropriate land use for the premises, as is appropriate in considering a PDP. Among the specific considerations which are stated in the regulations for the propriety of a PDP are the economic and efficient use of land, with a harmonious variety of land uses and safe and convenient vehicular access. See Art. II, §§ 8.01.01, 8.01.02 and 8.06.14 of the Regulations. More general considerations are stated in Art. II, § 8.06.03: in order to approve a PDP, the commission must find that the "proposed land uses are compatible with the location andnatural land features of the site" (emphasis added) and that incompatible uses are avoided. Because the commission was, in the consideration of the PDP, acting legislatively, considerable latitude is to be extended by the reviewing court. See, e.g., Protect Hamden/North Haven v. Planning Zoning Commission, 220 Conn. 527, 542-44 (1991).[7] A reviewing court should disturb the decision of the zoning commission only if the action is clearly contrary to law or clearly in abuse of its discretion. ProtectHamden, supra; Schwartz v. Planning Zoning Commission, 168 Conn. 285
(1975). A review of the proceedings shows that the commission was familiar with the site, the condition and topography of the roadway, the various land uses and the traffic and access patterns and made a reasonable choice.[8] Insofar as legislative decisions need to be supported by evidence, I cannot say that the commission acted in total disregard of facts at its disposal. and the commission was obviously concerned with the intensity of use. This ground does not support reversal.
The second reason advanced to support reversal is a claim that the commission failed to approve the application, when the application conformed with applicable regulations. This reason makes sense only in the context of approval of site plans, special permits and the like. See generally Quality Sand Gravel, supra. I have previously held that the action of the agency was not analogous to action on a site plan or special exception. Accordingly, this reason is unavailing.
The third reason advanced in the complaint is that the commission denied the application for reasons not properly before the commission. CT Page 16004 The argument seems to be that traffic considerations are not specifically enumerated as grounds for denial, and a commission may not go outside the bounds of the specific regulations in acting on applications. There is considerable dispute as to whether commissions are permitted to rely on more vague and general considerations when acting in an administrative capacity. Compare, e.g., DeMaria v. Planning Zoning Commission,159 Conn. 534 (1970) with Lurie v. Planning Zoning Commission,160 Conn. 295 (1971), for discussions, and apparently differing results, as to the latitude afforded commissions in recognizing and applying general considerations when specific standards have been met. Again, however, the discussion is based on the premise that the action complained of is administrative. Because the action in this case was legislative, and because the broad legislative standards were met in any event, this ground does not provide relief.[9]
The fourth ground advanced in the complaint is that the commission acted illegally because the regulations were vague, contain no ascertainable standards and allow unfettered discretion on the part of the commission. In its brief, Sam's seems to refine the argument to claim that the uniformity requirement of § 8-2 (a) of the General Statutes is violated by unpredictable, arbitrary and haphazard application of the regulations. See also Harris v. Zoning Commission, 259 Conn. 402, 428-30
(2002). The purpose of the "uniformity rule" is to provide fair notice to applicants and to compel equal treatment of applications. Harris, supra. In light of the prior discussion, and of the language of Harris to the effect that regulations need only be reasonably precise and not necessarily exact; id., 434-35; I find that the general criteria in the regulations regarding the approval of PDP applications are precise enough for legislative purposes and that the commission acted within its discretion.[10]
It also cannot be successfully maintained that the CUD regulations exceed the legislative authority granted to zoning agencies by the legislature. Section 8-2 of the General Statutes bestows broad powers that include the ability to address the "location and use of buildings, structures and land", and the "density of population" and to consider "congestion in the streets",
Two arguments should be specifically considered. Sam's seems to claim that because gasoline stations are a permitted use in a CUD zone, and, according to Sam's, the commission used improper reasons in denying the use, the regulations either were violated or are unintelligible. Again, a close reading of the regulations leads to a different result. According to the regulations, gasoline stations may be permitted in a CUD zone by special exception, to be considered by the ZBA. Art. II, § 8.04.01. CT Page 16005 This language should be contrasted with the language of Art. II, § 8.03, which lists uses which more simply are permitted. In any event, this argument puts the cart before the horse. The land use category of gasoline station does not have to be granted legislatively in the first instance with respect to any PDP, and the land use category (X) may, in the legislatively broad discretion of the commission, be found to be inappropriate for the location by applying the broad guidelines of Art. II, § 8.10.03 and its incorporated sections. If the land use category for gasoline stations is found legislatively to be an appropriate land use, then the special exception analysis is pertinent.
Finally, Sam's argues that requiring two agencies to deal with the special exception violates § 8.2 of the General Statutes. The short answer is that only one agency deals with the special exception, and that stage was never reached with respect to this application.
The real difficulty facing Sam's, it seems to me, is the inherent difficulty in applying traditional zoning concepts to the floating zone. The regulations are, perhaps necessarily, complex. It is only with painstaking care that one can parse the regulations. But there are significant benefits to the developer in a floating zone: although the zoning authorities exercise more control and exercise more discretion than in traditional zoning, they also exercise far more flexibility. Sam's availed itself of the flexibility when it applied for the original PDP, and it ought to have known that a subsequent request for a different category of land use would begin the legislative and therefore discretionary process anew. The criteria to be applied were broad, and Sam's did not have the right to a zone change, in effect, without the exercise of legislative discretion.
The appeal is dismissed.
___________________, J. Beach